562 So.2d 1238 (1990)
John Reed SAUCIER
v.
STATE of Mississippi.
No. 07-KA-58705.
Supreme Court of Mississippi.
April 25, 1990.
*1239 Herman F. Cox, Jimmy D. McGuire, McGuire & Cox, Gulfport, for appellant.
Edwin Lloyd Pittman, Atty. Gen., Mike C. Moore, Atty. Gen., Jackson, Jack B. Lacy, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
DAN M. LEE, Presiding Justice, for the Court:

I.
Today's appellant tenders serious questions regarding the right to counsel and the circumstances under which an accused's actions may constitute a waiver of that right. During initial custodial interrogation the accused admitted involvement in an armed robbery. The record reflects that he was repeatedly advised of his right to counsel while being interrogated and that he effectively waived same. The answers he gave were therefore admissible as evidence against him. We have reviewed all of the evidence in the record and find that the judgment of the Circuit Court should be affirmed.

II.

A.
The victim in this case, Linda Laferreire, drives a taxi. In the early morning hours of June 29, 1986, she was sitting in her taxi parked outside a storefront on U.S. Highway 90 in Biloxi, Mississippi. Approximately 2:00 a.m., a man, later identified as Saucier, accompanied by a woman, approached the taxi and asked Laferreire for a ride to Point Aux Chenes Road outside the city limits of Ocean Springs, Mississippi in Jackson County, fifteen miles from their location. Laferreire agreed. Saucier entered the taxi, seating himself behind Laferreire, the woman seating herself next to him on the backseat. Approximately thirty to forty minutes later they reached their destination.
Following directions from her passengers, Laferreire pulled the cab into the driveway of an abandoned house located in a dimly lit location at the end of the dead end street. Saucier then leaned forward and placed what felt and appeared to be a gun to the back of Laferriere's head and demanded money. The woman got out of the taxi and stood to its left. Saucier then leaned over the seat and picked up a pouch that contained between twenty and thirty dollars. He then told Laferriere to lie down on the seat, whereupon he reached over, ripped the microphone from her dispatch radio, pulled the keys from the ignition and threw them into the surrounding brush. Saucier then exited the taxi.
Laferriere sat up and saw a car approach from behind. She watched as Saucier turned, said good-bye, then proceeded into *1240 the car with his female companion and drove away. Laferriere then went to a home in the neighborhood and called for help. Officer Patricia Cooley of the Sheriff's department arrived at the scene between 3:00 and 4:00 a.m.
On July 27, 1986, almost one month after the robbery, the mother of a minor contacted the Ocean Springs Police Department concerning her son's participation in an armed robbery with John Reed Saucier. Det. Louis G. Miller of the Ocean Springs Police Department spoke with the minor about the armed robbery, determined that it had occurred in Jackson County, outside his jurisdiction, and contacted Officer Charles B. Polifrone of the Sheriff's Department. Miller then contacted Laferriere and had her meet him at the Ocean Springs Police Department.
Laferriere and Miller met Polifrone at the home of Justice Court Judge Raymond Beaugez that same evening, July 27, 1986. Laferriere filled out an affidavit and the officers obtained a search warrant for Saucier's arrest. Immediately thereafter, Miller, Polifrone and several other officers proceeded to Saucier's home.
Saucier was present when the officers arrived with the warrant. The officers, one of whom had prior dealings with Saucier, read him his Miranda rights, which included his right "to have an attorney present during any questioning and/or interrogat[ion]," and requested Saucier's consent to search the home for weapons. Responding that they would find no weapons in the house, Saucier signed a consent form for a search of his home.
Following the search of his home, Saucier was transferred to the Ocean Springs Police Department where he was, for the second time, advised of his Miranda rights. Saucier refused to sign a waiver of his rights, even though he signed an acknowledgment that he had been informed of his rights and understood them. He was then asked where the weapons were, to which he responded, "I hid them." Thereafter, Saucier talked with the officers regarding the armed robbery and, in his own words, "I did, in a way, admit to doing the armed robberies, but not exactly. I talked sort of in circles." Before being transferred to Pascagoula, Saucier told one of the officers where the weapons could be found.
While incarcerated in Pascagoula on July 28, 1986, Saucier met with his parole officer, Becky Fulton, regarding revocation of his parole based on the armed robbery charges. Before discussions were had, Ms. Fulton read Saucier the Miranda warnings; they then discussed the revocation hearing. Saucier was adamant about his wishes: he wanted to invoke his right to waive the hearing. Fulton checked with her supervisor and, because of the seriousness of the situation, refused to allow Saucier to waive the hearing. A revocation hearing was, in fact, held.
The following morning, July 29, 1986, Saucier was approached by two (2) law enforcement officers. For the fourth time Saucier was read the Miranda warnings; this time he signed an acknowledgment that he had been informed of his rights and understood them, as well as a separate waiver of those rights, attached at the bottom of the rights form. Specifically, the waiver stated "I, [signed by John R. Saucier], have been informed of my right to remain silent and the right to have any attorney present... . I fully understand those rights. I wish to waive those rights and agree to answer questions and/or make a statement. I do this voluntarily." See p. 1243, infra. He was asked if he was going to make a statement, to which he replied, "Yes, I am." Saucier then proceeded to give a full confession which was tape recorded and later transcribed. The admission of this confession into evidence is the subject of the first assignment of error.

B.
On October 20, 1986, the Grand Jury of Jackson County returned an indictment formally charging John Reed Saucier, together with Elizabeth Jane Miles and the minor, with armed robbery. Miss. Code Ann. § 97-3-79 (Supp. 1989). The charges against Saucier were severed for trial.
*1241 The taped confession was the subject of a Motion to Suppress by Saucier. Following a suppression hearing, the trial court found the statement admissible as having been given freely, voluntarily and knowingly.
Saucier stood trial on April 18, 1987, and was found guilty as charged. The jury was unable to agree on the matter of punishment whereupon the Circuit Court sentenced Saucier, then thirty-one years old, to a term of twenty-five years in the custody of the Mississippi Department of Corrections.
This appeal has followed.

III.

A.
Saucier made three incriminating statements in the first day and a half following his arrest  each without the benefit of counsel. On the morning of Monday, July 28, 1986, Saucier told where the gun(s) were and admitted involvement, though principally blaming the minor participant. Later that day Saucier met with a parole officer and again made incriminating admissions. On Tuesday morning, July 29, 1986, Saucier gave a full tape-recorded confession which was later transcribed. On appeal, Saucier charges error in the Circuit Court's overruling his objection to each.
The facts are crucial. Between 1:45 and 2:00 a.m. on July 28, 1986, a number of law enforcement officers proceeded to Saucier's residence to execute a warrant for his arrest. Capt. Paul Herrington of the Jackson County Sheriff's Department served Saucier with the warrant and read him what are commonly known as the Miranda rights. Det. Miller then spoke with Saucier and obtained his consent to search the house.
The officers then transported Saucier to the Ocean Springs Police Department. Det. Charles B. Polifrone read Saucier his rights once again and Saucier signed a form at 3:14 a.m. acknowledging that he had been informed of his rights and understood them. Det. Polifrone then asked Saucier to sign a waiver of his rights. Saucier refused. The waiver form is marked "Refused  CBP" and is dated July 28, 1986, at 3:15 a.m. Det. Miller then asked about weapons and Saucier responded "I hid them." Det. Miller, aware that "them" "was supposed to be a handgun and a shotgun," told Saucier that if the guns were found by someone "a kid or whatever and discharged ... some kids picked it up and shot one another or shot themselves with it ... it could look bad on him." Saucier said nothing. On this factual point, the record indicates that Det. Polifrone came back into the interrogation room where Saucier stated at the suppression hearing that he "talked in circles" concerning his involvement in the robbery.
Shortly thereafter, as officers were about to transport Saucier to Pascagoula, he said to Miller "I need to talk to you." Saucier and Miller stepped into a little lounge, a kitchen-type area, at the Ocean Springs Police Department and Saucier then told Miller he had hid the guns under a bush in the backyard. Saucier then admitted some involvement in the armed robbery but, according to Miller, "he put the monkey on the kid's back." At daylight the next morning officers recovered the weapons.
On July 28, 1986, after Saucier had been transported to the Jackson County Adult Detention Center in Pascagoula, he was approached by Becky Fulton, a probation and parole officer with the Mississippi Department of Corrections. Officer Fulton was supervising Saucier incident to his parole.[1] Fulton served Saucier with a warrant for parole violation. The purpose of the meeting was solely to discuss Saucier's revocation hearing. Both Ms. Fulton and Saucier testified at the suppression hearing regarding their meeting. A review of their testimony is warranted.
*1242 The direct examination of Ms. Fulton taken at the suppression hearing regarding Saucier's rights and alleged invocation of right to counsel follows:
Q. Okay. And did you ask him about his involvement?
A. Right. I advised Mr. Saucier of his rights, and he discussed the two charges with me.

Q. All right. Would you tell the Court, and for the record, Mrs. Fulton, what rights you advised him, specifically, what the rights were  what you told him in regard to his rights?
A. I normally have a card that I carry. It's his Miranda rights.
Q. The Miranda warnings?
A. Right.
Q. Okay. And it was the full and complete Miranda warnings?
A. Yes, it was.
Q. Did you advise him that he had a right to an attorney before he talked to you?
A. Yes, I did.
Q. Did you advise him that he could cease questioning at any time he wanted to until  and have an attorney present?
A. Yes.
Q. Okay. Did you tell him he could remain silent  anything he said could be used against him?
A. Yes.
Q. Okay. You told him all of that, didn't you?
A. Right. Uh-huh.
Q. Did he ask you, or did he indicate to you in any manner that he wanted an attorney?

A. No.

* * * * * *
Q. All right. When you read him his rights, did he appear to understand them to you?
A. Yes, he did.
Q. And did he indicate that he wanted an attorney, or he would go ahead and talk to you?

A. We discussed the charges, and he asked me if I would contact Tom Fortner for him.

Q. He asked you if you would?

A. Right.

Q. Okay. And did you?

A. Right. I contacted Mr. Fortner's office.

Q. Okay. And what did Mr. Fortner tell you?
A. I don't recall whether I talked to Mr. Fortner or to his secretary. Normally, we just contact Mr. Fortner's office to advise him that we do have a subject in jail under new charges, and that we would like for his office to talk with the person in jail.

Q. Did you have this conversation before he told you of his involvement?
A. I don't recall.
Q. Okay. Well, Mrs. Fulton, if he had said, no, I want an attorney  I mean, would you have questioned him any further?

A. No.

Q. Did he indicate to you that he wanted an attorney present?

A. No.

Q. And you're not sure if he, maybe later in the conversation, he asked for you to contact Tom Fortner for him?
A. He just asked me some time that morning, or that day, before I left the jail, if I would contact Tom Fortner's office.

Q. And you did?
A. And I did.
* * * * * *
Q. And he was  was he fully cooperative with you?
A. Yes.
Q. And he never asked you for, you know, to have an attorney present?

A. No.

Q. Did he ask you whether or not he wanted to see an attorney?

A. I don't believe he did.

*1243 Q. All he asked you was, please contact Tom Fortner for me?

A. Right.

Q. And tell him I'm out here at the jail?
A. Right.
Saucier's direct testimony at the suppression hearing regarding his meeting with Ms. Fulton was as follows:
Q. Now, on Monday morning after you had been brought over here  Monday morning the 28th  the morning of your arrest  did you have occasion to talk to Becky Fulton from the Department of Probation and Parole?
A. [By Saucier] I can't remember if it was that morning that I talked to her, or if it was that afternoon. I did talk to her on that day.
Q. And what did y'all talk about, or what did she say to you? What was the gist of y'all's conversation?
A. As far as I can remember, the whole conversation was  that she came over, she told me that she had to issue a warrant for a retake on me so I could not make bond. And she asked me, she said, "John, what in the world are you doing in a mess like this?" My answer was, "I do not know." She said, "Well, look, I'm going to get in touch with Tom Fortner for you." She said, "Tom is the public defender." She said, "I know you can't afford a lawyer, so I'm going to get in touch with Tom for you." She said, "Tom is really about the best lawyer around here."

A review of the above indicates that the testimony of Fulton and Saucier is essentially the same on the invocation of the right to counsel: Saucier did not invoke his right to counsel. Fulton positively testified on several occasions that Saucier did not, at any time, ask for an attorney. Saucier himself testified that it was Fulton who offered to get him counsel. Nowhere in his suppression hearing testimony does Saucier say he asked Fulton to get him an attorney. Since Saucier did not invoke his right to counsel, the taped confession pursuant to written waiver of rights was admissible.
Assuming arguendo that Saucier did, in fact, invoke his right to counsel on July 28, 1986, when he was with his probation officer Fulton, the confession was still admissible because Saucier knowingly, voluntarily and intelligently waived, in writing, his alleged prior invocation. A copy of the rights and waiver form signed by Saucier is included herein for clarity:
BEFORE WE ASK ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS:
YOU HAVE THE RIGHT TO REMAIN SILENT. ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OR THE PROCEEDINGS. YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT DURING ANY QUESTIONING AND/OR INTERROGATING. IF YOU CANNOT AFFORD AN ATTORNEY, AND SO DESIRE, ONE WILL BE APPOINTED FOR YOU PRIOR TO ANY QUESTIONING.
IF YOU CHOOSE TO ANSWER QUESTIONS OR MAKE A STATEMENT, YOU HAVE THE RIGHT TO STOP AT ANY TIME.
I, [signed by John R. Saucier], HAVE READ (OR HAVE HAD READ TO ME) THE ABOVE STATEMENT. I HAVE BEEN INFORMED OF MY RIGHTS AND FULLY UNDERSTAND THOSE RIGHTS.
SIGNED: [John R. Saucier]
WITNESS: [signed by James O'Bryant and Det. C.B. Polifrone]
DATE: July 29, 1986 TIME: 9:30 AM
WAIVER OF RIGHTS
I, [signed by John R. Saucier], have been informed of my right to remain silent and the right to have an attorney present. I have been informed that in the event that I cannot afford an attorney, one will be appointed for me. I fully understand those rights. I wish to waive those rights and agree to answer questions and/or make a statement. I do this voluntarily. There *1244 have been no promises or threats made to me.
SIGNED: [J.R. Saucier]
WITNESS: [signed by James O'Bryant and Det. C.B. Polifrone]
DATE: July 29, 1986 TIME: 9:32 AM
(emphasis added).
The United States Supreme Court recognizes the right of a criminal defendant to waive his right to counsel. See Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). When Saucier signed the waiver form, he voluntarily, and in writing, waived his right to counsel at that time, whether previously invoked or not. Had Saucier desired the assistance of counsel at any point during his statement, he was free to say so and the waiver would have immediately been of no further effect, for a waiver is effective only so long as the criminal defendant wishes it to be. Minnick v. State, 551 So.2d 77, 85 (Miss. 1988) citing Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 2395 n. 5, 101 L.Ed.2d 261 (1988). However, Saucier did not ask for assistance of counsel; to the contrary, he signed a document acknowledging that he understood he had a right to have an attorney present and specifically waived that right.
Additionally, when Saucier met with his parole officer, Fulton on July 28, 1986, he was adamant about invoking his right to waive the revocation hearing. Given Saucier's prior experience with uncounseled confessions and their use against him in a court of law, See Saucier v. State, 328 So.2d 355 (Miss. 1976), it is readily apparent that had Saucier desired to invoke his right to counsel, he would have been equally adamant on that point as well.
The rules regarding admissibility of confessions or other inculpatory statements are familiar. The Miranda warnings must be given. Rule 1.03, Miss.Unif.Crim.R.Cir. Ct.Prac. (1979); Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966); Jones v. State, 461 So.2d 686, 696-97 (Miss. 1984). The accused must then give a knowing and voluntary waiver of both his right to remain silent and his right of access to counsel. Powell v. State, 540 So.2d 13, 16 (Miss. 1989); Pinkney v. State, 538 So.2d 329, 342 (Miss. 1988).
If the accused indicates in any manner at any time prior to or during questioning that he wishes to remain silent or to have access to counsel, the officers must cease interrogation. Jones v. State, 461 So.2d at 699. Where the accused asks for counsel, the officers may not resume interrogation until counsel has been provided, except where the accused voluntarily reinitiates the discussion of the charges. Leatherwood v. State, 548 So.2d 389, 395 (Miss. 1989); Burnside v. State, 544 So.2d 1352, 1354-55 (Miss. 1988). Where the defendant objects to the prosecution's use of a confession at trial as evidence against him, the prosecution bears the burden of proving beyond a reasonable doubt each fact which is prerequisite to admissibility. Burnside v. State, 537 So.2d 420, 423-24 (Miss. 1988); Lutes v. State, 517 So.2d 541, 548 (Miss. 1987); White v. State, 495 So.2d 1346, 1347 (Miss. 1986).
On appeal, this Court's scope of review of findings of fact is limited by the familiar substantial evidence rule. Davis v. State, 551 So.2d 165, 169 (Miss. 1989). In this case the Circuit Court made no specific findings with respect to each of the three inculpatory statements, instead making a general finding of voluntariness and, hence, admissibility. Where this is so, we may, nevertheless, rely upon findings which are fairly implied in the ruling made by the court.
After a full evidentiary hearing, the trial court found Saucier's waiver to be knowingly, voluntarily and intelligently given. On that basis, the trial court found his confession to be admissible. Based on the foregoing, and finding no error in the ruling below regarding this first assignment of error, we affirm thereasto.

IV.
There is another serious question presented for review. On the morning of trial Saucier moved for an order precluding the prosecution's use of his prior murder *1245 conviction[2] for impeachment. The Circuit Court denied the motion. Saucier appeals this ruling.
On February 19, 1973, when he was seventeen years old, Saucier shot and killed a police officer and was thereafter tried and convicted of murder and sentenced to life imprisonment. Saucier served eight years in the custody of the Mississippi Department of Corrections and was released on parole on June 9, 1982. Upon Saucier's motion in limine, he represented that he desired to appear as a witness in his own defense but that he would be precluded from doing so if the court held that the prosecution could present his prior conviction for impeachment. The Court ultimately ruled that the prior conviction could be introduced consistent with Rule 609, Miss. R.Ev.,[3] and at trial Saucier did not take the stand.
We are aware that such a ruling may have "a chilling effect on his right to testify." Hawkins v. State, 538 So.2d 1204, 1206 (Miss. 1989). We have not yet decided whether we will follow the federal course and hold that, to preserve the issue for appellate review, the defendant must take the witness stand and be subjected to impeachment by the prior conviction. See Luce v. United States, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). At the very least, a defendant wishing to present the point on appeal, absent having taken the witness stand himself, must preserve for the record substantial and detailed evidence of the testimony he would have given so that we may gauge its importance to his defense. For example, we can conceive of the case where a defendant may have a bona fide alibi defense which, as a practical matter, is hardly likely to persuade the jury if the defendant himself does not testify and subject himself to cross-examination by the prosecution. If such a defendant has in his distant past a conviction of a serious felony, as here, he may well be faced with a Hobson's choice in deciding whether to testify. On the other hand, if a defendant in fact has nothing of substance to say in his own defense, we are hardly likely to give the time of day to his suggestion that his right of allocution was chilled by the foreknowledge that the prosecution would present his prior conviction.
The hearing on the motion in limine was held prior to our decisions in Signer v. State, 536 So.2d 10, 12-13 (Miss. 1988); Leon Johnson v. State, 529 So.2d 577, 585-88 (Miss. 1988); McInnis v. State, 527 So.2d 84, 85-89 (Miss. 1988); L.V. Johnson v. State, 525 So.2d 809, 811-13 (Miss. 1988); and Peterson v. State, 518 So.2d 632, 635-38 (Miss. 1987). In those cases we have made clear that Rule 609 is to be taken seriously, and that that rule effectively repeals any notion that a prior felony conviction works a corruption of blood, rendering the convicted felon thereafter a witness unworthy of belief. As a threshold point, the prosecution is required to show that the conduct giving rise to the prior conviction was such that it bears upon the witness' propensity for truthfulness. McInnis v. State, 527 So.2d at 88-89. Once the prosecution makes this prima facie showing, the *1246 circuit court is required to consider and balance at least five separate factors and make an on-the-record determination on each and on the ultimate question of whether the probative value of the prior conviction on the issue of the witness' truthfulness outweighs its prejudicial effect. Peterson v. State, 518 So.2d at 638.
Notwithstanding, although we have carefully reviewed this point, we cannot say that error was committed of such gravity that reversal is required. See Rule 103(a) Miss.R.Ev.

V.
Saucier tenders several additional issues for review.

A.
The weapon used in the robbery was a black metal pellet gun weighing three or four pounds. Saucier points to the fact that there was a piece missing from the weapon rendering it inoperative and, in any event, that it was not loaded and thus was not a "deadly weapon" within our armed robbery statute. See Miss. Code Ann. § 97-3-79 (Supp. 1989). We have inspected the gun and without doubt it could have been used to club the victim and thereby inflict serious bodily injury. As a matter of law, this weapon is a "deadly weapon" within the statute. See Davis v. State, 530 So.2d 694, 702-03 (Miss. 1988); Duckworth v. State, 477 So.2d 935, 938 (Miss. 1985); Jackson v. State, 404 So.2d 543, 544 (Miss. 1981); Cittadino v. State, 199 Miss. 235, 243-47, 24 So.2d 93, 95-96 (1945). Of course, the constitution precludes a directed verdict for the prosecution on any essential element of the offense charged. Accordingly, we may only hold that this weapon was not such that Saucier was entitled to have the issue taken from the jury and decided in his favor.

B.
Saucier argues that there was insufficient probable cause for his arrest and, hence, the warrant issued by Justice Court Judge Raymond Beaugez and his arrest pursuant thereto were unlawful. The point is specious. The affidavit presented to Judge Beaugez was made by the victim, Laferreire, who personally appeared before Judge Beaugez and described fully what had happened. In addition, Judge Beaugez was advised that Officer Miller had been contacted by the mother of the minor participant and advised of her son's was involvement in the robbery with Saucier. We are told nothing which seriously suggests any infirmity in the arrest of Saucier. See Rule 1.01, Miss.Unif.Crim.R.Cir.Ct. Prac.; Lockett v. State, 517 So.2d 1317, 1324 (Miss. 1987); Moore v. State, 493 So.2d 1295, 1298 (Miss. 1986).

C.
Saucier challenges Laferreire's incourt identification of him as her robber and assailant on grounds that it was tainted by her extensive observance of Saucier at the pre-trial parole revocation hearing. The record, however, reflects more than an adequate basis for overruling defense objection on this point.
Laferriere testified at the suppression hearing concerning her opportunity to observe Saucier at the time of the robbery. In addition to the facts previously mentioned, she noted that Saucier had spoken with her, at a distance of two to three feet, a few minutes before hiring her to drive to Ocean Springs. Additionally, the dome light was on while the car was stopped during the robbery. Finally, she observed Saucier as he stepped from the cab, turned and said good-bye, and walked to the getaway car.
On this record the point is without merit. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); York v. State, 413 So.2d 1372 (Miss. 1982).

D.
Saucier presents several additional issues for review which merit neither discussion nor reversal. See Ford v. State, 546 So.2d 686, 690 (Miss. 1989); Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988); Kennedy *1247 v. State, 531 So.2d 638 (Miss. 1988); Morea v. State, 329 So.2d 527 (Miss. 1976).

VI.
The judgment of the Circuit Court that Saucier stand convicted of the crime of armed robbery, together with the sentence imposed thereon of twenty-five (25) years imprisonment should be, and they hereby are, affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ANDERSON and BLASS, JJ., concur.
HAWKINS, P.J., specially concurs by separate written opinion, joined by SULLIVAN, J.
ROBERTSON, J., dissents as to part III, joined by PRATHER, J.
PITTMAN, J., not participating.
HAWKINS, Presiding Justice, specially concurring:
The U.S. Supreme Court has held in unmistakable language that when an accused tells an investigating officer he wants an attorney, the questioning must stop unless or until the accused on his own initiates further conversation about the crime, and this bar applies not only to the questioning officer, but any other law enforcement officer as well. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court has also held that if a law enforcement officer is present when an accused is being arraigned on a criminal charge and hears the accused inform the magistrate he wants an attorney to represent him on the charge, the 6th Amendment prohibits the law enforcement officer from thereafter questioning him about any crime unless or until the accused initiates the subject. In the latter instance the 6th Amendment protects the accused for the same reason lawyers commonly recognize it is unethical to converse with a client about matters upon which an attorney is representing him out of the presence of that attorney. Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); see also the dissent in Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).
Each case involving such claim of a 6th Amendment violation should be examined on the facts of that particular case.
Here we have an accused who has been questioned about a crime, after being given all his Miranda warnings, including the right to have an attorney, yet waiving all of them and talking freely about the crime, although it is true he did not divulge all at the time.
Later, a parole officer questioning him about a parole violation tells him he will have to appear before a probation hearing to see if his parole is going to be revoked, and asking him if he wants an attorney for that purpose. He tells the parole officer that he does.[1]
Thereafter, a law enforcement officer totally unaware of the conversation between the parole officer and Saucier, starts to question Saucier about the crime. Before doing so, however, the officer again verbally gives Saucier all of the Miranda warnings, including the right to counsel, and then presents him with another Miranda form to read and sign, showing a waiver of his right to counsel. And Saucier freely talks about the crime.
Should the 6th Amendment prohibit a confession thus obtained?
In just what context did he want a lawyer?
Saucier never testified that when he said he wanted a lawyer he wanted one before being further questioned about the crime he had freely discussed with the officers, or simply a lawyer to represent him at the parole violation hearing.
Was the circuit judge supposed to read his mind?
*1248 Suppose someone had informed Saucier his wife was suing him for divorce, and asked him if he wanted to call a lawyer for him, and Saucier had replied, "yes."? Would that have invoked his 6th Amendment right to counsel?
SULLIVAN, J., joins this opinion.
DAN M. LEE, P.J., concurs in result only.
ROBERTSON, JUSTICE, DISSENTING:

I.
Today's appeal tests our fidelity to the Supremacy Clause of the United States Constitution. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) established a bright-line rule that an accused in custody who has
expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
451 U.S. at 484-85, 101 S.Ct. at 1884-85, 68 L.Ed.2d at 386. Of course this was nothing new to readers of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) without a bent of mind. Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), and Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) but say to the doubting Thomases, "We really mean it!"
The bright-line form of the Miranda-Edwards-Jackson-Roberson rule is all the more remarkable when so much of today's federal criminal constitutional procedural jurisprudence is presented in the form of balancing tests, cost-benefit analyses, attended often by searches for totalities of circumstances, all of which are but opportunities, if not invitations, to those who would evade and avoid to do precisely that. In sharp contrast the Roberson Court noted
We have repeatedly emphasized the virtues of a bright-line rule in cases following Edwards as well as Miranda. [Citations omitted] ... This gain in specificity, which benefits the accused and the state alike, has been thought to outweigh the burdens that the decision in Miranda imposes upon law enforcement agencies... .
486 U.S. at 681-82, 108 S.Ct. at 2098, 100 L.Ed.2d at 713. The other day Chief Justice Rehnquist removed any doubt regarding the form (and substance) of the rule when, speaking of Jackson, he said
Thus, to help guarantee that waivers are truly voluntary, Jackson established a presumption which renders invalid some waivers that would be considered voluntary, knowing and intelligent under the traditional case-by-case inquiry called for by Brewer v. Williams [430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)].
Michigan v. Harvey, ___ U.S. ___, ___, 110 S.Ct. 1176, 1179-80, 108 L.Ed.2d 293 (1990). See also, Satter v. Solem, 434 N.W.2d 725, 727 (S.D. 1989). Jurists from Holmes to Hawkins regularly remind us that a rule that is not enforced is not much of a rule. See, The Western Maid, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299, 303 (1922); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920); Box v. State, 437 So.2d 19, 21 (Miss. 1983). Notwithstanding, today's majority strides headlong into the wind and relies quite clearly on what the rule  and the Constitution on which it is based  have declared off limits.

II.
No doubt, what John Reed Saucier said to Detective Miller in the kitchen-type lounge was self-initiated and hence admissible. Unless I have lost my ability to read, the Edwards-Jackson-Roberson trilogy declares Saucier's subsequent statements inadmissible. Unless I have lost my ability to reason, Kirkland v. State, 559 So.2d 1046 (Miss. 1990), which faithfully follows and enforces the trilogy, requires reversal here.
As the majority notes, after Saucier had been transported to the Jackson County *1249 Adult Detention Center in Pascagoula, he was approached by Becky Fulton, a probation and parole officer with the Mississippi Department of Corrections. Officer Fulton was supervising Saucier incident to his parole. Fulton served Saucier with a warrant for parole violation and then read him his rights. Rule 1.03, Miss.Unif.Crim.R.Cir.Ct. Prac. (1979). Under our law Saucier's right to counsel had, prior to this moment, attached as well. See, e.g., Minnick v. State, 551 So.2d 77, 83 (Miss. 1989); Magee v. State, 542 So.2d 228, 233 (Miss. 1989); Nixon v. State, 533 So.2d 1078, 1087-88 (Miss. 1987); Jimpson v. State, 532 So.2d 985, 988 (Miss. 1988); May v. State, 524 So.2d 957, 967 (Miss. 1988); Nicholson v. State, 523 So.2d 68, 77 (Miss. 1988); Livingston v. State, 519 So.2d 1218, 1220 (Miss. 1988); Williamson v. State, 512 So.2d 868, 876 (Miss. 1987); Tolbert v. State, 511 So.2d 1368, 1375 n. 5 (Miss. 1987); Page v. State, 495 So.2d 436, 440 n. 5 (Miss. 1986).
Saucier's right to counsel and right to remain silent thus coalesced,[1] and the factual question is whether at this time Saucier effectively waived his right to deal with the state through counsel. The question may only be resolved by a combined reading of the testimony of the two witnesses to the critical conversation: Officer Fulton and Saucier himself.
Officer Fulton's direct examination at the suppression hearing reads, in pertinent part, as follows:
Q. All right. When you read him his rights, did he appear to understand them to you?
A. Yes, he did.
Q. And did he indicate that he wanted an attorney, or he would go ahead and talk to you?
A. We discussed the charges, and he asked me if I would contact Tom Fortner [Jackson County Public Defender] for him.
Q. He asked you if you would?
A. Right.
Officer Fulton says she then contacted Fortner's office but he was not in. She then continued to question Saucier whereupon he asked to waive his preliminary parole revocation hearing. In further colloquy with Assistant District Attorney Harkey, Fulton was asked:
Q. And he never asked you for, you know, to have an attorney present?
A. No.
Q. Did he ask you whether or not he wanted to see an attorney?
A. I don't believe he did.
Q. All he asked you was, please contact Tom Fortner for me?
A. Right.
Saucier then admitted to Fulton that he had committed the robbery of a taxi cab driver.
When his turn came, Saucier denied that he discussed the armed robbery charge with Fulton but confirmed that Fulton had told him she would call public defender Tom Fortner. Saucier's words were:
She said, "Well, look, I'm going to get in touch with Tom Fortner for you." She said, "Tom is the public defender." She said, "I know you can't afford a lawyer, so I'm going to get in touch with Tom for you." She said, "Tom is really about the best lawyer around here."
All of this happened on Monday, before the important statement, procured from Saucier on Tuesday morning, July 29. I am as prone to fallacy as anyone, but given this testimony I do not see how a fair minded fact finder could fail to find that Saucier effectively invoked his right to counsel. Both Saucier and Fulton testified that each understood Fulton was to call Tom Fortner for Saucier. Fortner was the Public Defender. Nothing suggests Fortner was needed to keep Saucier in cigarettes, *1250 or to discharge some biblical duty. What possible purpose could there have been for Fulton calling Fortner other than to afford Saucier representation for the parole revocation/armed robbery charges? When would it ever be more important that Saucier have representation on those charges than then, before any further questioning?
I fail to find significance in whether Saucier asked for Fortner or Fulton offered to call Fortner. Common sense cries out that controlling significance be given Saucier's objectively reasonable understanding the moment after Fulton agreed to call Fortner. The testimony in the record to my mind yields only the understanding that Fulton had agreed to call Fortner; otherwise, we must regard it as so much gibberish.
I cannot account for the majority's reading of the record. Of course, this Court's scope of review of findings of fact is limited by the familiar substantial evidence rule. Davis v. State, 551 So.2d 165, 169 (Miss. 1989). But in this case the Circuit Court made no specific findings with respect to any of the three inculpatory statements, instead making a general finding of voluntariness and, hence, admissibility. Where this is so and where findings on the precise points at issue on appeal are not clearly inferrable from the findings made, our scope of review is considerably broader. See Jones v. State, 461 So.2d 686, 700 (Miss. 1984); cf. Tricon Metals & Service, Inc. v. Topp, 516 So.2d 236, 238 (Miss. 1987); Pace v. Owens, 511 So.2d 489, 492 (Miss. 1987). This is particularly so where, as here, on the critical fact the record is uncontradicted.
Fulton says without equivocation that she read Saucier his rights and that Saucier asked that she call Public Defender Fortner but then seems to say that he talked to her about the robbery anyway. The ambiguity arguably present must be resolved against the prosecution for several reasons. First, the law requires that an accused's request for access to counsel while under interrogation must be scrupulously honored. Griffin v. State, 504 So.2d 186, 195 (Miss. 1987); Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Second, the nature of custodial interrogation and judicial inquiries into the facts of particular instances cry out for a "bright line" rule that is consistently enforced. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981); Arizona v. Roberson, 486 U.S. 675, 680-81, 108 S.Ct. 2093, 2097-98, 100 L.Ed.2d 704, 713-14 (1988); Leatherwood v. State, 548 So.2d 389, 395 (Miss. 1989); see also Horton v. State, 408 So.2d 1197, 1199 (Miss. 1982). Third, at the suppression hearing, Saucier enjoyed a (rebuttable) presumption against waiver. Michigan v. Jackson, 475 U.S. at 633, 106 S.Ct. at 1409, 89 L.Ed.2d at 640; Minnick v. State, 551 So.2d at 84; Cannaday v. State, 455 So.2d 713, 723 (Miss. 1984); Abston v. State, 361 So.2d 1384, 1391 (Miss. 1978). Fourth, the prosecution bears the burden of proving beyond a reasonable doubt each prerequisite to admissibility. Burnside v. State, 544 So.2d 1352, 1354 (Miss. 1988); Lutes v. State, 517 So.2d 541, 548 (Miss. 1987). Among these requisites the prosecution must prove "an intentional relinquishment or abandonment of a known right." Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); Minnick v. State, 551 So.2d at 84. Anything less is not a waiver. Abston v. State, 361 So.2d 1384, 1390 (Miss. 1978). An enforceable waiver does not follow from a "showing only that he responded to further police-initiated custodial interrogation." Edwards v. Arizona, 451 U.S. at 484, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. Finally, case after case suggests  as an obvious corollary to the other premises  that doubts must be resolved in favor of the accused. See, e.g., Michigan v. Jackson, 475 U.S. at 633, 106 S.Ct. at 1409, 89 L.Ed.2d at 640; Jones v. State, 461 So.2d at 699; In re Wilder, 347 So.2d 520, 521 (Miss. 1977). These considerations coalesce to require resolution of any ambiguity in Saucier's favor, a principle at the core of Kirkland. See also, People v. Plyler, 86 Mich. App. 272, 277, 272 N.W.2d 623, 626 (1978) ("an ambiguous indication of an interest in having counsel requires cessation of police interrogation."); People *1251 v. Cerezo, 635 P.2d 197, 198 (Colo. 1981) ("I think I better have a lawyer."); Singleton v. State, 344 So.2d 911, 912 (Fla.App. 1977) ("Maybe I better ask my mother if I should get [an attorney]."); State v. Blakney, 185 Mont. 470, 477, 605 P.2d 1093, 1097 (1979) ("[M]aybe I should have an attorney."); Wentela v. State, 95 Wis.2d 283, 287, 290 N.W.2d 312, 316 (1980) ("I think I need an attorney," or "I think I should see an attorney."); but see, State v. Robinson, 427 N.W.2d 217, 223 (Minn. 1988); Long v. State, 517 So.2d 664, 667 (Fla. 1987).
It escapes me how the legal mind may find a distinction of consequence when the facts of Saucier's request for counsel are compared with Bobby Kirkland's request that we considered only last week. Kirkland recites:
It is possible that Kirkland may have meant, when he asked the justice court judge for a court appointed lawyer, only that he needed a lawyer to represent him at trial. In any event, he did state he wanted the court to appoint a lawyer for him, which Fortenberry clearly heard.
In Kirkland we gave the defendant the benefit of the doubt, as the law requires. This week we march 180 degrees in reverse and give the prosecution the benefit of a legally indistinguishable doubt.

III.
If the accused indicates in any manner at any time prior to or during questioning that he wishes to remain silent or to have access to counsel, the officers must cease interrogation. Edwards v. Arizona, 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386; Jones v. State, 461 So.2d at 699. Where the accused asks for counsel, the officers may not resume interrogation until counsel has been provided, except where the accused voluntarily reinitiates the discussion of the charges. Edwards v. Arizona, 451 U.S. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386; Michigan v. Jackson, 475 U.S. at 626, 106 S.Ct. at 1405, 89 L.Ed.2d at 636; Arizona v. Roberson, 486 U.S. at 680-81, 108 S.Ct. at 2097, 100 L.Ed.2d at 714; Leatherwood v. State, 548 So.2d 389, 395, (Miss. 1989); Burnside v. State, 544 So.2d 1352, 1354-55 (Miss. 1988). We reiterated these principles in Kirkland.
Only because the majority so steadfastly denies it, I repeat Chief Justice Rehnquist's recent formulation of the rule that once a criminal defendant has invoked his right to counsel
a subsequent waiver of that right  even if voluntary, knowing, and intelligent under traditional standards  is presumed invalid if secured pursuant to police-initiated conversation. We held [in Michigan v. Jackson] that statements obtained in violation of that rule may not be admitted as substantive evidence in the prosecution's case in chief.
Michigan v. Harvey, 110 S.Ct. at 1177. Because Saucier's right to counsel had attached, had been invoked, and not thereafter effectively waived, the voluntariness inquiry the majority deems so crucial is rendered legally irrelevant! The reason there can be no effective waiver is that nothing in the testimony the majority quotes so liberally suggests that Saucier voluntarily initiated further conversations (as he clearly did with Detective Miller earlier that morning).
Jackson is instructive on the issue of the scope to be accorded a request for counsel. Defendants were interrogated on one charge while in custody on another unrelated charge in connection with which they had invoked their right to counsel. The prosecution argued that the defendants "may not have actually intended their request for counsel to encompass representation during any further questioning by the police." Jackson, 475 U.S. at 632-33, 106 S.Ct. at 1409, 89 L.Ed.2d at 640. Jackson rejected this narrow interpretation, reiterating the presumption that a request for representation must be read broadly to encompass all situations. Id. at 633, 106 S.Ct. at 1409, 89 L.Ed.2d at 640-41. Here, of course, that can only mean Saucier's request for counsel incident to his parole revocation proceedings extended to the principal charge of armed robbery, if, for no other reason than the common sense one, that the factual predicate of the two charges were identical. Roper v. State, *1252 258 Ga. 847, 375 S.E.2d 600, 603 (1989) well articulates this point. Though there can be no doubt of the law, Chief Justice Rehnquist has recently reiterated that it
bars police-initiated interrogation following a suspect's request for counsel in the context of a separate investigation.
Butler v. McKellar, ___ U.S. ___, 110 S.Ct. 1212, 1216, 108 L.Ed.2d 347 (1990); see also, Sutherland v. State, 299 Ark. 86, 771 S.W.2d 264, 265 (1989); White v. Commonwealth, 725 S.W.2d 597-98 (Ky. 1987).
Saucier invoked his right to counsel in his conversation with parole officer Fulton. What he told Fulton thereafter may not be used as evidence against him. Our next question is whether Detectives Bryant and Polifrone were bound thereby when they approached Saucier on the morning of Tuesday, July 29. This is by far the more critical point, for the officers emerged with a full tape-recorded confession. Arizona v. Roberson, 486 U.S. at 687-88, 108 S.Ct. at 2101, answers the question. If the accused requests access to counsel, all officers of the prosecution force are bound thereby, even those who have no actual knowledge of the request. Arizona v. Roberson, 486 U.S. at 687-88, 108 S.Ct. at 2101, 100 L.Ed.2d at 717; see also, Alston v. State, 554 A.2d 304, 310 (Del. 1989).
The operative fact is Saucier's request for counsel made on the afternoon of Monday, July 28, to parole officer Fulton.[2] There is no evidence that on the following morning Saucier voluntarily reinitiated discussions of the charges with Officers Polifrone and Bryant, nor is there any evidence that counsel had in fact been made available to Saucier. Under these circumstances, I would have thought the Edwards-Jackson-Roberson trilogy left us no alternative but to hold that the Circuit Court erred when it overruled Saucier's objection to the prosecution's offer of the July 29 confession into evidence. Leatherwood v. State, 548 So.2d at 396; Burnside v. State, 544 So.2d at 1354-55.

V.
I have considered whether this error requires reversal, given the other evidence of Saucier's guilt. The standard, of course, is that the error must have been harmless beyond a reasonable doubt. The confession at issue is by far the most powerful evidence of Saucier's guilt. It was the evidence that removes reasonable doubt that Saucier committed the crime. As such, its admission should require reversal. Mitchell v. State, 495 So.2d 5, 12 (Miss. 1986); Jones v. State, 461 So.2d 686, 701 (Miss. 1984).
PRATHER, J., joins this opinion.
NOTES
[1] On February 19, 1973, John Reed Saucier shot and killed Earl W. Phillips, Sr., a Harrison County law enforcement officer. Saucier was tried in the Circuit Court of Harrison County and convicted of murder on March 14, 1974, and sentenced to life imprisonment. Saucier appealed to this Court which on March 9, 1976, affirmed. Saucier v. State, 328 So.2d 355 (Miss. 1976). Saucier was released on parole on June 9, 1982.
[2] See note 1, supra.
[3] In relevant part, Rule 609 reads as follows:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.
(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
[1] Even this attorney request is ambiguous, because according to Saucier, he never asked for an attorney then. She simply told him she was getting him one. But give him the benefit of the doubt. Let's concede he did ask for an attorney to represent him at that parole violation hearing.
[1] Fusion of the standards for invoking and waiving the right to counsel and the right to remain silent is congenial to Mississippi law in that, unlike the United States Constitution, they are found in the same sentence in the same provision of our Bill of Rights. Miss. Const. Art. 3, § 26 (1890). The remarriage of these rights in federal law is among the happier conceptual developments of recent years. See, e.g., Michigan v. Harvey, 110 S.Ct. at 1179-80. When we add time of attachment rules well embedded in our law (see cases cited above) the coalescence is complete.
[2] On this point today's case is wholly distinguishable from our recent decision in Davis v. State, supra. In Davis, Officer Cleon Butler admitted that Davis asked for a lawyer. Three officers took the stand thereafter and stated that Officer Butler was in error. The Circuit Court then expressly found as a fact that Officer Butler was in error. In today's case we have testimony from Officer Fulton and Defendant Saucier which is essentially the same on all critical points. No one else was present while Fulton and Saucier were talking; hence, we have no officer contradicting Fulton's testimony that Saucier asked for a lawyer, nor do we have a Circuit Court finding of fact that the request for a lawyer was not made.