738 So.2d 300 (1999)
Derrick BENNETT, Appellant,
v.
STATE of Mississippi, Appellees.
No. 97-KA-01541COA.
Court of Appeals of Mississippi.
March 23, 1999.
Rehearing Denied June 8, 1999.
Certiorari Denied August 26, 1999.
*302 George T. Holmes, Jackson, Attorney for Appellant.
Office of the Attorney General by Pat S. Flynn, Attorney for Appellees.
BEFORE THOMAS, P.J., LEE, AND SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. Derrick Bennett was convicted of murder by a Hinds County Circuit Court jury. On appeal he argues that the trial court erred in restricting his impeachment use of prior convictions of two of the State's witnesses, in admitting evidence of past criminal acts by Bennett, in denying his motions for a directed verdict or a new trial, and in holding defense counsel in contempt. We find no reversible error and affirm.

FACTS
¶ 2. Sheree Glickman was found dead on the morning of December 25, 1995. She had been shot through the left side of her chest. The bullet traveled through her chest cavity and into her right arm. Her body was in the driver's seat of a red Chevrolet Berretta which had run off the road and into a fence. A "crack pipe" was also found in the vehicle.
¶ 3. Beatrice Wiggins testified that Glickman had asked her about buying $100 worth of crack cocaine as an illicit Christmas gift for Glickman's husband. A heavy price was soon extracted for this conduct. Wiggins flagged down Bennett, whom she knew as "Red," so that Glickman could purchase the cocaine. Rather than make the exchange, however, Bennett drove off with Glickman's money. Glickman angrily rammed Bennett's car. She initially continued to follow Bennett as he drove away, but since her eleven-year-old son was sleeping in the car, she returned in order to leave him with Wiggins. Glickman then resumed her pursuit. According to Wiggins, this occurred about 2:40 a.m. Christmas day. She heard a gunshot some ten minutes later.
¶ 4. Other individuals become important to the story. Nekeith Newsome was in the car with Bennett. He testified that Wiggins flagged down the car, asked for cocaine, and that Bennett got out to discuss the matter. Newsome did not know what was said, but after Bennett returned to the car Wiggins followed and told him not to "do her [Glickman] like that." Newsome agreed that Glickman rammed Bennett's car with her own, but that Bennett got away and went to the home of Josh Wilder.
¶ 5. While at Wilder's home, Daryl Davis came in and bought drugs from Bennett. He then went outside. Later, Glickman drove up. According to Davis, Glickman asked if she could buy crack cocaine. Davis went inside Wilder's home, allegedly bought cocaine, then returned it to Glickman. At her request, Davis gave her a crack pipe to use. Davis then got into her car and both drove off. He testified that while they were driving, someone in another car pulled alongside and fired into their car. Glickman lost control, went off the road, and ran into a fence. She later died from the gunshot wound. Davis recognized *303 Kenny Brown as the driver and Bennett as the shooter. Davis got out of the wrecked car and was allegedly going for help when he was picked up by Bennett and Brown. With Bennett still displaying the gun, Davis agreed not to reveal what had happened.
¶ 6. Kenny Brown's version of what happened begins at Wilder's home when Bennett and Newsome arrived, which would have been after Glickman first tried to purchase cocaine and had rammed Bennett's vehicle, but before she herself went to Wilder's and picked up Daryl Davis. Brown stated that Bennett told him to drive Bennett to get some money from a lady. Brown went where he was told. He eventually pulled alongside Glickman's car, and Bennett fired into it. Glickman's car ran off the road and into a fence. Brown returned Bennett to Wilder's home. There was conflicting testimony as to what Bennett said, if anything, when he allegedly shot Glickman.

DISCUSSION

ISSUE 1: The prosecution's motion in limine
¶ 7. The State presented a motion in limine to prevent the defense from cross-examining the State's witness Daryl Davis regarding two offenses to which he had plead guilty, namely burglary and grand larceny. Cross-examining on Davis's conviction for receiving stolen goods was not included in the motion in limine as the State felt that offense was proper impeachment. The State also requested that another witnesses, Nekeith Newsome, not be cross-examined on his prior conviction for grand larceny. The trial court granted the motion.
¶ 8. Impeachment of witness credibility based on previous criminal convictions is governed by Rule 609 of the Mississippi Rules of Evidence. There is a threshold inquiry for 609(a)(1) analysis. The party desiring to impeach a witness with a prior conviction must first make out a prima facie case that the crime has probative value as to the witnesses's truthfulness. Saucier v. State, 562 So.2d 1238, 1245 (Miss.1990). This applies whether the prosecutor is attempting to impeach a defendant or whether a defendant is attempting to impeach a witness. Id. Bennett merely recited that burglary and grand larceny were crimes of falsehood (which is not generally true) and that their probative value outweighed their prejudicial effect. Since they are not considered crimes of falsehooda point addressed in detail belowthat adds nothing to the conclusory allegation that probative value outweighs prejudice. We find the trial court within its discretion to reject counsel's argument.
¶ 9. The second section of this part of the rule automatically permits use of prior convictions of crimes of falsehood. M.R.E. 609(a)(2). Burglary is not generally considered to be a crime weighing sufficiently on truth and veracity. Townsend v. State, 605 So.2d 767, 770 (Miss.1992). The same holds true for the crime of grand larceny. The supreme court has held that this crime is not generally a Rule 609(a)(2) exception. Blackman v. State, 659 So.2d 583, 585 (Miss.1995).
¶ 10. We find no error in the trial judge's barring use of these prior convictions for impeachment.

ISSUE 2: Testimony regarding prior criminal activity by Derrick Bennett
¶ 11. Bennett complains that a prosecution witness, Beatrice Wiggins, was allowed to testify about unrelated previous drug sales made by the defendant. The controlling evidentiary rule states that "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M.R.E. 404(b).
*304 ¶ 12. The relevant evidence is this. After testifying that Mrs. Glickman wanted to buy $100 worth of crack cocaine, the witness was asked the following by the prosecutor:
Q. Okay. Did you do anything to help her out?
A. Yes. I flagged down a D boy.
Q. You flagged down a D boy?
A. I flagged down a dope boy who sells crack.
Q. All right. And had you flagged down that person before? Did you know him before?
A. Yes, sir. I knew him.
¶ 13. First, Bennett's objection to the statement of prior contact for drug sales was not raised until five more questions were asked. Thus the objection arguably was untimely. Bennett did not object until after the exchange between the prosecution and its witness was completed and after the witness identified the defendant as the man to whom she was referring. It is incumbent upon an attorney to make an objection as soon as possible and not wait until the fact finder is exposed to the entirety of the objectionable evidence. See Young v. State, 425 So.2d 1022, 1027-28 (Miss.1983). Still, there was not significant delay, and we will address the issue.
¶ 14. Evidence of the prior connection regarding drug sales arguably supports the witness's identification of Bennett. Identity is one of the issues for which prior bad conduct evidence is admissible. M.R.E. 404(b). It is true that some elliptical reference to the reason the witness had prior contact with Bennett was an alternative, such as "I had several prior contacts with the defendant that made me certain of his identity." Conversely, such ambiguous phrasing may create more damaging suspicions about the defendant than the fact of former drug sales.
¶ 15. At trial the prosecutor argued that the evidence was admissible because the prior contacts were closely related to the charged crime. Prior bad acts can be admitted when they are so much a part of the charged crime that they could be considered part of a single event or as part of a closely related series of events. Brown v. State, 690 So.2d 276, 286 (Miss.1996). The State argued that this testimony was intertwined with the instant crime in that this homicide grew out of Bennett's drug dealing. We agree that the crime in this case was inexorably involved with drug activities. The victim's own illegal shopping was the sole reason for her encounter with Bennett. We find no error in the trial court's refusal to remove from the jury's consideration the one brief statement that Beatrice Wiggins knew to flag Bennett down when she had a customer for drugs.

ISSUE 3: Sufficiency of evidence for murder
¶ 16. Without conceding the evidence was sufficient to support any conviction, Bennett argues that at best the evidence only supported a manslaughter conviction.
¶ 17. Daryl Davis testified that he heard someone in the other car say "this is for my mother's car, bitch," before the shots were fired. That statement allegedly proved Bennett's anger that the victim had rammed the car that Bennett had borrowed from his mother. Bennett wishes us to focus on Kenny Brown's testimony that Bennett said that the victim should stop and give him his money, but then said he could not recall what was said. Brown also testified that no words were exchanged immediately before or after the shooting. The jury's chore was to choose among the evidence.
¶ 18. Regarding whether Bennett had premeditation, we note that premeditation may be formed in a very short period. The time interval between the car ramming incident and the shooting, if the testimony of various witness's is to be reconciled, must have been long enough for Mrs. Glickman to come back and drop her son *305 off with Ms. Wiggins, drive to Josh Wilder's house, have Daryl Davis buy her some crack, drive off with him, allow Bennett to flag down Kenneth Brown, and have those two locate Mrs. Glickman. This allows more than enough time to form premeditation. Bennett's actions of flagging down Kenneth Brown and pursuing the victim may well establish it.
¶ 19. It is true that Mrs. Glickman stated that she wished she had a gun, but there was no evidence that she had one. Ms. Glickman chased Bennett and even rammed his car. Equally clear is that she did not catch Bennett. This was not argued as a self-defense case; thus, whatever peril he may have reasonably felt earlier had long passed by the time of the shooting.
¶ 20. Kenneth Brown testified that Bennett wanted money from Mrs. Glickman and that Brown did not perceive any murderous intent. He testified that he felt that Bennett had acted on impulse. Bennett also argues that if he fired, he did so only to damage Mrs. Glickman's car as retribution for the damage that she had done to his vehicle. The jury was free to give all this testimony and possible inferences weight, but it was not compelled to accept any of it. The jury simply is not obligated to accept as accurate any single witness's version of contested events.
¶ 21. Bennett argues that the shot was fired only after Mrs. Glickman's car swerved towards the vehicle in which Bennett was riding. Brown did testify on direct examination essentially to what Bennett here claims, but he later contradicted that testimony.
Q. Well, tell us about that. Tell us how it happened.
A. [Brown] Well, I recall I think the car like kind of likekind of like swerved toward me, and that's when the shot was fired.
Q. Who fired the shot?
A. Derrick Bennett.
¶ 22. However, on cross-examination, Brown testified as follows:
Q. Now, you said, I believe, did you not, that this blue car swerved toward your car?
A. Yes, sir.
Q. And that swerve came before the shot was fired, correct?
A. The swerve came after the shot.
Q. The swerve came after the shot was fired. So it's your testimony that the car swerved first towards your car and then into the fence?
A. Yes, sir.
¶ 23. The jury was free to accept one account over the other one.
¶ 24. The testimony presents much conflict, with the entire array of witnesses, possible perpetrators, and victim involved in pernicious conduct. It was for the jury to determine whom to believe and when to believe them. Hickson v. State, 707 So.2d 536, 544 (Miss.1997). There was adequate evidence to prove each element of the offense charged.

Issue 4: Defense counsel's contempt of court.
¶ 25. The defense attorney was found guilty of contempt and fined $100 for violating the trial court's motion in limine order. Appeal of this order has been included in the appeal of Bennett's conviction. We must first decide whether this is civil or criminal contempt.
¶ 26. A person may be imprisoned or fined for either civil or criminal contempt. Knowles v. State, 708 So.2d 549, 557 (Miss.1998). Where the purpose for the sanction is to compel compliance with a court order, the matter involves civil contempt. Hinds County Board of Supervisors v. Common Cause of Mississippi, 551 So.2d 107, 120 (Miss.1989). As is frequently said, if the person in contempt has the "keys" to his own release, namely, the performing of the previously avoided act, then this is civil contempt. 2 *306 JEFFREY JACKSON, MISSISSIPPI CIVIL PROCEDURE § 16A:3 at 16A-5 (1998). If a fine is imposed for civil contempt, it is generally paid to an aggrieved party and not to the court; the fine attempts to measure the damage suffered. Id. § 16A:4 at 16A-7.
¶ 27. On the other hand, if the order is entered as unalterable punishment for having violated a court directive, the matter involves criminal contempt. Common Cause, 551 So.2d at 120-21. Whether fine or incarceration, the punishment is just thata set penalty for which a contemnor's change of heart will not release him. JACKSON, CIVIL PROCEDURE, § 16A:4 at 16A-6.
¶ 28. Here, Bennett's attorney was not being incarcerated nor fined only until he agreed to purge himself of the contemptuous conduct. He was given a fixed punishment for having violated the court's order granting the State's motion in limine. That is criminal contempt. The often confused labels that a trial judge uses do not control; the clarity or ambiguity of the contempt order as well as the procedures followed to enter the contempt sanctions are what govern. Here, a fine was levied for conduct that occurred in the trial judge's presence. Such conduct is labeled direct contempt. Varvaris v. State, 512 So.2d 886, 887 (Miss.1987). Summary punishment is appropriate for direct contempt; there is no process that is due prior to the imposition of the penalty. Id. at 888; JACKSON, CIVIL PROCEDURE, § 16A:5 at 16A-8.
¶ 29. The trial court's order imposing the $100 fine on counsel was styled as if it were an order in the Bennett prosecution. However, criminal contempt is a separate action in which a bond must be posted before an appeal is authorized. Miss.Code Ann. § 11-51-11 (Supp.1998); Varvaris, 512 So.2d at 887. Since no bond was posted, and indeed no separate notice of appeal was filed within 30 days of the court's refusal to reconsider its judgment of contempt, the matter is not properly before this court.
¶ 30. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.