STATE of North Dakota, Plaintiff
and Appellee

v.

Leland Thomas ASH, Defendant
and Appellant.

Cr. No. 940048.

Supreme Court of North Dakota.

Jan. 19, 1995.

James M. Vukelic (argued), Asst. Atty. Gen., Bismarck, for plaintiff and appellee.

David F. Senn (argued), Dickinson, and William G. Heth (appearance), Dickinson, for defendant and appellant.

MESCHKE, Justice.

Leland Thomas Ash appealed the jury verdict, an order denying his motion for new trial, and the judgment convicting him of murder. We affirm.

Ash, a Montana resident, was temporarily working in the area of Hettinger, North Dakota, during February 1993. On February 19, Ash and two other men left Hettinger at about 11:00 p.m. and drove to Lemmon, South Dakota. At a tavern there, Ash met Kevin Kern, who had given Ash a ride from Lemmon to Hettinger the previous weekend. After closing time early on February 20, 1993, Ash and Kern went to a party in a private home in Lemmon, until they left to return to Hettinger in Kern's pickup after 4:00 a.m.

While Ash and Kern were stopped at an approach a few miles from Hettinger, Kern was shot in the head behind the left ear by Ash, who later claimed that the shooting was accidental. Ash returned Kern's rifle to its case behind the seat in Kern's pickup, put Kern's body in the passenger side of the pickup, and drove toward Hettinger. Ash left the highway, however. He took Kern's body out of the pickup, dragged it into a field, and covered it with snow.

When Ash attempted to turn the pickup around, it got stuck in a ditch. Ash started running toward Hettinger. He hitched a ride to the Mirror Lake Lodge in Hettinger, where he had been staying. There, Ash told his roommate that he had been in a fight in Lemmon. Ash put his bloody clothes in a garbage bag, that he placed in a garbage dumpster.

Ash was convicted of murder and sentenced to life imprisonment. He appealed with an agglomeration of arguments.

### I. Continuance and deposition

Ash contends that the trial court abused its discretion in refusing a continuance early in the trial to allow his attorney to travel to San Antonio, Texas, to take a videotape deposition of a defense expert witness. On December 7, 1993, the first day of trial, Ash's attorney advised the court that on December 6, 1993, Dr. Vincent Di Maio told him that he would not be coming to North Dakota to testify on December 13, 1993, as scheduled. Counsel requested permission to travel to San Antonio and take Di Maio's deposition on Saturday and present it to the court the following Monday or Tuesday. Instead, the court offered two alternatives: Di Maio could testify on Saturday morning, or a videotaped deposition of Di Maio could be recorded in San Antonio, with counsel participating by telephone. Di Maio chose not to come to North Dakota to testify on Saturday, leaving only the option of a videotaped deposition by telephone. Ash argues that this caused problems in getting all the exhibits copied, marked, and made available in San Antonio and disabled Di Maio from reviewing the prior deposition of John O'Neill, a prosecution witness.

The trial had already been postponed once to accommodate Di Maio's schedule, Di Maio had in his possession every exhibit that defense counsel questioned him about, and O'Neill's deposition was available and defense counsel could have provided it to Di Maio. A motion for a continuance rests in the discretion of the trial court and its decision to grant or deny a continuance will not be set aside absent an abuse of discretion. *State v. Kunkel,* 452 N.W.2d 337 (N.D.1990). We conclude that the trial court's denial of a continuance was not an abuse of discretion. We also conclude that the videotaped deposition of Di Maio recorded in San Antonio, with the attorneys participating by telephone, was a reasonable accommodation of Di Maio's schedule and Ash's right to present a defense. We, therefore, conclude that the trial court did not abuse its discretion in requiring that procedure and in refusing a continuance to allow Ash's attorney to travel to San Antonio for an in-person video deposition.

### II. Evidentiary rulings

#### a.

Ash contends that the trial court erred in allowing two photographs, State's Exhibit No. 1 and State's Exhibit No. 58, into evidence. Exhibit 1 was a family photograph of Kern, his wife, and their children. Ash objected to its admission on the ground that it was irrelevant.

Exhibit 58 is a February 25, 1993, photograph of Ash on his way to court for his initial appearance. Ash's attorney objected to it:

I would object to the picture as being irrelevant at this point. It's just prejudicial and he is being led around by a police officer with the handcuffs on. I don't know what the probative value of the picture is.

The prosecutor responded:

It's not uncommon for someone who has been accused of murder to have handcuffs on, so I don't think that is unduly prejudicial. . . . Moreover, several witnesses have identified the Defendant as having long hair which matches the description in this photograph, but does not, of course, match the description of the Defendant as he appears today.

The State observed in its appellate brief:

These same witnesses might well have had a difficult time recognizing the defendant at trial as he had lost 40 pounds, cut his hair to less than ½ inch in length, and shaved his mustache during the 10 months preceding trial.

■■ The admission or rejection of photographs is within the discretion of the trial court. *State v. Ohnstad,* 359 N.W.2d 827

(N.D.1984); *Larson v. Meyer*, 135 N.W.2d 145 (N.D.1965). While NDREv 403 gives a trial court the power to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, that power should be sparingly exercised. *State v. Zimmerman*, 524 N.W.2d 111 (N.D.1994). Our review of a trial court's evidentiary ruling under NDREv 403 is limited to determining if the court abused its discretion. *Zimmerman* at 116 points out that "any prejudice due to the probative force of evidence is not unfair prejudice."

■ Exhibit No. 1 served to identify the victim for the jury by replacing an intangible, formless decedent with a face and personality. The picture imparted to the jury an idea of his size compared to his wife, who was in the picture and in the courtroom, and compared to Ash, also present in the courtroom. This comparison was more illustrative than the statement that he was "[f]ive foot, nine inches" tall and weighed 205 pounds. This picture was relevant to upcoming testimony about Kern's body being placed in a pickup and later dragged into a field, and the exhibit gave the jury insight into the strength required to perform those acts.

Exhibit 58 showed Ash as many of the witnesses saw him at around the time of the crime. Ash's appearance was very much different at the time of trial. The photo better apprised the jury of Ash's strength and muscularity at the time of the crime, than his appearance at trial did.

The challenged photographs were relevant and not unfairly prejudicial. We conclude that the trial court did not abuse its discretion in admitting the photographs into evidence.

b.

■ While cross-examining Adams County Sheriff Robert Bartz, Ash's attorney asked: "Why is motive an important factor in a homicide case?" The prosecutor objected on relevancy grounds. The trial court ruled:

Mr. Senn, I will allow you to question the witness concerning the actions taken by the witness in an effort to identify motive. I believe that is a proper inquiry. But, as to why motive is important, in other words, why the witness bothered to inquire in the first place, I believe is not a factual question to pose to the witness. . . .

Ash contends that he "was denied his right to present an adequate defense by not being allowed to cross-examine the witness as to why motive was important." We disagree.

The trial court instructed the jury as to motive:

Proof of a motive for commission of a crime is permissible and often valuable, but never essential. . . . Evidence of motive is sometimes of assistance in removing doubt and completing proof that otherwise might be unsatisfactory. . . . The absence of motive is a circumstance tending to support the presumption of innocence, and should be given such weight and credibility as you think it deserves.

In *State v. Potter*, 60 N.D. 183, 233 N.W. 650, 658 (1930) (quoting 16 C.J. 547, § 1048), this court stated the rule on evidence of motive: " '[E]vidence tending to show motive or absence of motive on the part of the accused is relevant and admissible, and . . . a wide latitude in the admission of this kind of evidence is permissible.' "

Sheriff Bartz's personal view of the importance of motive in a homicide case is of marginal relevance at best. Ash was given wide latitude in cross-examining Sheriff Bartz about the presence or absence of a motive. We deem it unnecessary to detail the entire course of inquiry of Bartz by Ash's attorney on the matter of motive. It is sufficient that Ash's attorney was able to inquire and to establish that Bartz had tried to discover a motive in this case, but was unable to do so.

We conclude that the trial court did not abuse its discretion in refusing to allow Ash to examine Sheriff Bartz about the importance of motive in a homicide case. From Ash's establishment that Sheriff Bartz had tried to discover a motive, but was unable to do so, together with the trial court's instruction on motive, we conclude that Ash was not prejudiced in any way by the court's refusal to allow examination of Bartz about the importance of motive.

## c.

Ash contends that the trial court erred in allowing cross-examination of him about his prior conviction for aggravated assault. The trial court allowed the evidence under NDREv 404,[1] and NDREv 609.[2]

In *State v. Stevens*, 238 N.W.2d 251, 257–58 (N.D.1975) [overruled in part, on other grounds in *State v. Himmerick*, 499 N.W.2d 568, 572 (N.D.1993)], this court articulated the factors for determining whether to allow evidence of other crimes, wrongs or acts:

> First, a much stricter showing of relevancy is required to prove identity or the doing of the criminal act by the accused, than when it is offered to prove knowledge, intent, or state of mind. . . .
>
> Second, the courts have often held that there must be substantial evidence of prior similar acts, or, as some courts put it, the evidence must be "clear and convincing."
>
> Third, before such evidence may be considered at all, there must be proof of commission of the crime charged. . . .
>
> In the final analysis, the question before the court, trial or appellate, is one of balancing the aims of full disclosure and fairness to the defendant where they are in conflict. The basic question is fundamental fairness.

Those factors do not bar use of Ash's earlier aggravated assault conviction.

It was not fundamentally unfair to allow the State to attempt to establish a connection between Ash's probation conditions for the earlier aggravated assault conviction and Kern's death. Among other conditions, Ash could "not frequent any place where intoxi-cating liquor or beer is the chief item of sale nor shall he use intoxicants or beer," had to "maintain as steady employment as possible," and had to abide by the rules and regulations of the Montana Adult Probation and Parole Field Services. By connecting a breach of those conditions with Kern's death, the State was trying to establish a motive and to undercut Ash's accident defense.

This court set out in *State v. Anderson*, 336 N.W.2d 123 (N.D.1983), a number of factors to consider when determining whether or not to allow evidence of other crimes for impeachment purposes under NDREv 609(a):

> (1) The impeachment value of the prior crime.
>
> (2) The point in time of the conviction and the witness' subsequent history.
>
> (3) The similarity between the past crime and the charged crime.
>
> (4) The importance of the defendant's testimony.
>
> (5) The centrality of the credibility issue.

*Id.* at 126 [quoting *United States v. Mahone*, 537 F.2d 922, 929 (7th Cir.1976)]. Ash contends that the trial court "did not go through the analysis as is required in *Anderson* and properly weigh the probative effect of the prior conviction against the prejudicial effect." We disagree.

This record shows that the Adams County Assistant State's Attorney specifically addressed the *Anderson* factors in arguing for admission of the evidence. The trial court thereafter specifically found that the "probative value outweighs, in my judgment,

---

1. NDREv 404(b) instructs:

 *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

2. NDREv 609(a) instructs:

 *General Rule.* For the purpose of attacking the credibility of a witness, (i) evidence that a witness other than an accused has been convicted of a crime must be admitted, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime must be admitted if the court determines that the probative value of admitting that evidence outweighs its prejudicial effect to the accused; and (ii) evidence that any witness has been convicted of a crime must be admitted if it involved dishonesty or false statement, regardless of the punishment.

the prejudicial effect of the conviction itself." We conclude that the trial court did not abuse its discretion in allowing Ash's prior conviction into evidence. In weighing probative value and prejudice, 1 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence*, ¶ 403[03], pp. 403–49, 403–51 (construing FREv 403), says that "[t]he usual approach on the question of admissibility ... is ... to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."

### d.

■ Ash contends that the trial court erred in allowing Ash's Montana probation officer, Debra Willis, to testify. Ash contends that her testimony was irrelevant. A copy of Ash's judgment and commitment for aggravated assault was introduced through Willis. Willis testified that Ash did not have permission, as required under the conditions of his probation, to be working at Hettinger, North Dakota, or to be in South Dakota for any purpose. This rebutted Ash's testimony that he had a "travel pass" to work in North and South Dakota. Willis's testimony was relevant for its impeachment value and for showing that Ash was in violation of the conditions of his probation. The trial court did not abuse its discretion in allowing Willis to testify.

### e.

Ash contends that the trial court erred in allowing questions on cross-examination that went beyond the scope of the direct examination of the defense expert witness, Dr. Vincent Di Maio, who testified by video deposition about the distance between the muzzle of the gun and Kern's entrance wound. On cross-examination, the prosecuting attorney asked:

Doctor, assuming that a rifle has no design defect, no broken parts, minimal wear and operated normally when tested. Would you agree that it would be highly unlikely for the rifle to accidentally discharge?

Ash's counsel objected that the question was outside the scope of the direct examination of the witness. The prosecutor responded that at the deposition, defense counsel's sole objection was that the question was outside the witness's expertise. The prosecutor added that Di Maio

does include that language in his book. He writes about it. And so ... I believe that that objection should be overruled and I also add ... as I have mentioned before, that had Dr. Di Maio come to North Dakota as was promised, he would have been subject to a subpoena, we would have been given the opportunity to ask him many questions that we would have done had he been called as a rebuttal witness. We were not afforded that opportunity and so I ask the Court for some consideration of that fact.

The trial court overruled the objection, stating its belief that the question was proper.

The prosecuting attorney asked on cross-examination:

Do the facts surrounding Kevin Kern, with which you are familiar, more closely resemble those of an accident or a homicide?

The trial court overruled defense counsel's objection that the question was irrelevant and beyond the scope of the direct examination.

The prosecutor also asked:

Of all the body organs, the heart, the liver, kidneys, lungs, brain, the main blood vessels, which organ is the most frequent target in murder cases?

The trial court overruled defense counsel's objection that the question was irrelevant and beyond the scope of the direct examination.

Ash contends that the trial court erred in allowing those questions that went beyond the scope of the direct examination of Di Maio and that did not pertain to his credibility. The questions were marginally relevant to the issue of the cause of Kern's death. NDREv 611(b) says that cross-examination should be limited to credibility of the witness and "the subject matter of the direct examination." Yet the rule also says: "The court, in the exercise of discretion, may permit inquiry into additional matters as if on direct examination." NDREv 611(b) does not rigidly prescribe direct examination and cross-examination of witnesses.

Ultimately, the scope of cross-examination lies within the sound discretion of the trial court. *State v. Jenkins*, 326 N.W.2d 67 (N.D.1982). The challenged questions were marginally within the scope of the direct examination of Di Maio, as they dealt with his view of the cause of Kern's death. The challenged questions certainly fell within the trial court's discretion to allow "inquiry into additional matters as if on direct examination." The trial court did not abuse its discretion in allowing the challenged questions.

### III. Instructions

#### a.

Ash contends that the trial court erred in failing to give his requested jury instruction on murder that had this sentence: "When a person commits an act through misfortune or by accident under circumstances that show neither criminal intent nor purpose, nor knowingly, he does not thereby commit a crime." The trial court refused the requested instruction, but part of the given instructions on murder said:

### MURDER

#### (Intentionally or Knowingly)

A person is guilty of Murder if he intentionally or knowingly causes the death of another human being.

### DEFINITIONS

For the purposes of these instructions, a person engages in conduct:

(a) "intentionally" if, when he engages in the conduct, it is his purpose to do so, or

(b) "knowingly" if, when he engages in the conduct, he knows or has a firm belief, unaccompanied by substantial doubt, that he is doing so, whether or not it is his purpose to do so.

"Accidental" and "intentional" are mutually exclusive terms, as are "accidentally" and "knowingly." Thus, establishment of intentional or knowing conduct precludes accident, and proper instructions defining intentionally and knowingly make unnecessary any instructions on accident. A court is not required to give jury instructions in the exact language requested by a defendant. *State v. Anderson*, 480 N.W.2d 727 (N.D.1992). Considered as a whole, jury instructions must correctly and adequately inform the jury of the applicable law. *Id.* The instructions given in this case correctly and adequately inform the jury of the applicable law. The trial court did not err in refusing to give Ash's requested instruction.[3]

#### b.

Ash argues that the trial court erred in giving this instruction on intent:

#### INTENT

The intent or purpose with which an act is committed is a mental process and generally remains hidden in the mind where it is conceived, and is rarely, if ever, susceptible of proof by direct evidence. Intent may be inferred from the outward manifestations, by the words or acts of the party entertaining it, and the facts and circumstances surrounding or attending upon the acts sought to be proved, with which it is claimed to be connected.

Ash does not contend that the instruction is an incorrect statement of the law, nor does he show in what way he might have been prejudiced by the instruction. Ash has not presented us with any citations to authorities or any supportive reasoning. This argument is, therefore, without merit.

### IV. Jury communication

Ash contends that the trial court erred in communicating with the jury without bringing the jury into the courtroom with Ash

---

**3.** An accident instruction may be appropriate in a case where an actor's state of mind is not necessarily exclusive of "accident." *See State v. Anderson*, 480 N.W.2d 727, 731 (N.D.1992) (Meschke, J., concurring). Thus, in a case where a lesser included offense involving "negligence" or "recklessness" is involved, an instruction on accident or misfortune would be apt. *See State v. Wiedrich*, 460 N.W.2d 680 (N.D.1990). *See also* 21 Am.Jur.2d *Criminal Law*, § 131 ("there is no criminal responsibility for an act committed through misfortune or by accident where there was no evil design, intention, or culpable negligence").

present. After the case was submitted to the jury, the jury delivered a note requesting a listing of exhibits. Without bringing the jury into the courtroom, without having the defendant present, and without objection, the court directed the clerk to prepare and deliver the requested exhibit list.

The jury later sent another note: "We would like the defendants courtroom testimony if possible." Without bringing the jury or the defendant into the courtroom, and without objection by counsel, the trial court sent back this response: "You should rely upon your recollection of all testimony of all witnesses."

 The jury sent a third note: "We would like to receive the tape player and final jury instructions." The clerk had inadvertently failed to deliver the final jury instructions and the court had them delivered. Also, without bringing the jury or the defendant into the courtroom, without objection by defense counsel, and over the prosecutor's objection, the trial court sent this response to the jury: "The audio tape was received into [ ] evidence, was played in open court while jurors followed along on a printed transcript. You should rely upon your recollection of the contents of this exhibit as presented."

NDCC 29–22–05 says:

> After the jurors have retired for deliberation, if they desire to be informed on a point of law arising in the cause, or to have any testimony about which they are in doubt or disagreement read to them, they, upon their request, must be conducted into the courtroom by the officer who has them in custody. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the state's attorney and the defendant or his counsel, or after they have been called.

After a case has been submitted to the jury, NDCC 29–22–05 requires that all communications with jurors be made in the presence of the defendant. *State v. Zimmerman,* 524 N.W.2d 111; *State v. Smuda,* 419 N.W.2d 166 (N.D.1988). In addition, NDRCrimP 43(a) requires that the defendant "be present ... at every stage of the trial."

 The trial court erred in responding to the jury communications without the defendant being present and without calling the jury into open court. Furthermore, under *State v. Zimmerman* and *State v. Schasker,* 60 N.D. 462, 235 N.W. 345 (1931), the trial court's communication with the jury, without bringing the jury into open court and without the presence of the defendant, not only violated the statutory directive, but it also violated Ash's constitutional right under Art. I, § 12, N.D. Const., to appear and defend in person and with counsel during the whole of his trial. To be sure, in two of the instances, the trial judge asked defense counsel, who was present, whether counsel wanted the defendant personally present before deciding what response to make. Each time, defense counsel said not, thereby waiving his client's right to be present, and thereby inviting error.

Because the trial court's error in communicating with the jury in the absence of the defendant has constitutional magnitude, we must determine if the error was harmless beyond a reasonable doubt. *Zimmerman.* Still, considering the jury's requests, defense counsel's repeated waiver, and the trial court's responses, it is clear to us that it would be unreasonable to conclude that Ash's presence or absence would have had any effect on the result. We discern no possibility of prejudice to Ash from these communications by the court with the jury outside Ash's presence, particularly when his counsel repeatedly waived the defendant's absence. Therefore, we conclude that the trial court's error was harmless beyond a reasonable doubt.

### V. Closing arguments

 Ash contends that he was prejudiced by three improper arguments and an improper demonstration by the prosecuting attorney in his closing arguments. The control of closing arguments is largely within the discretion of the trial court, and we will not reverse on the ground that a prosecutor exceeded the scope of permissible closing argument unless a clear abuse of the trial court's discretion is shown. *State v. Schimmel,* 409 N.W.2d 335 (N.D.1987). To establish an abuse of discretion absent a fundamental er-

ror, an accused must demonstrate that the prosecution's closing comments were improper and prejudicial. *Id.* at 342. "To be prejudicial, absent a fundamental error, improper closing argument by the state's attorney must have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the evidence." *Id.* at 342. Long ago, in *State v. Kent [Pancoast]*, 5 N.D. 516, 559, 67 N.W. 1052, 1064–65 (1896), this court declared counsel's duty in closing argument: "It is his duty to use all the convincing power of which he has command, and the weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record."

■ Defense counsel did not object to any of the arguments challenged here or to the demonstration, thereby failing to preserve those questions for appeal, unless they constitute obvious errors that we will consider even though not raised at trial. We exercise our power to consider obvious error cautiously and only in "exceptional situations where the defendant has suffered serious injustice." *State v. Smuda*, 419 N.W.2d 166, 168 (N.D.1988). This is not such a case.

■ Ash complains that the prosecutor argued reasons why Ash could not use the defenses of alibi, insanity, or self-defense and belittled his accident defense. The prosecutor's argument was not improper under *Schimmel* and *Kent*, and was an efficient way to summarize a possible view of the evidence.

■ The prosecutor discussed the burden of proof this way:

Remember this, this burden of proof, this concept of reasonable doubt is the same burden, it's the same standard that has been applied in every criminal case for decades. There isn't a single inmate at the North Dakota State Penitentiary who didn't have that same burden of proof, that same standard of reasonable doubt applied in his or her case.

Ash claims this argument was inappropriate and prejudicial. The argument was one method of undercutting defense arguments about the enormity of the State's burden of proving guilt beyond a reasonable doubt. The argument was calculated to tell the jury that finding guilt beyond a reasonable doubt was a frequent event, not an extraordinary one. In the circumstances of this case, this argument did not create reversible error.

■ Ash complains that one prosecution argument appealed to the passion and prejudices of the jury: "[Y]our verdict in this case will not bring Kevin back. You will not allow by your verdict that his family will ever hear him laugh again." We view the argument as simply emphasizing the irreversibility of Kern's death and its impact upon his family in response to Ash's defense tactic of calling his pregnant common-law wife to the stand in an effort to elicit sympathy for her, Ash, their daughter, and their unborn child. As such a reply, the argument was not improper.

■ Ash contends that another argument by the prosecuting attorney deprived him of a fair trial:

When this trial started, I heard a song on the radio that's been haunting me ever since and it's a Christmas carol. I know you are familiar with it. It goes, "Do you hear what I hear," and every time I would hear that I would remind myself this is the holiday season, it's a time when we are normally happy, a time that we spend with our family, when we look forward to hearing from old friends. Kevin won't be spending time with his family. He won't be hearing from old friends. He is not going to hear your verdict. But, when Mary Jane and those children gather around the Christmas table and they look at the chair where Kevin should be sitting, they will hear your verdict ringing in their ears. Don't let him lie his way out of this. Make [4] Kevin's soul rest in peace.

Perhaps melodramatic, this argument about the impact of Kern's death does not constitute obvious error requiring reversal of Ash's conviction.

■ During the course of his closing argument, the prosecutor and Sheriff Bartz

4. The State contends in its brief that the word actually used was "may," rather than "make."

presented a demonstration interpreting the evidence. The State's brief described it this way:

> Sheriff Bartz was permitted to lie on the floor of the courtroom, in full view of the jury, while the State's counsel stood over him with the rifle aimed behind the sheriff's right ear and at a distance of less than two inches. The angle of the trajectory which was demonstrated to the jury was virtually identical to the angle testified to by the pathologist who conducted the autopsy of the victim. The muzzle-to-target distance, given Ash's height, the height of the victims head as it lay on the ground, and the length of the rifle, was consistent with the State's theory of the case.

Ash contends the demonstration was inappropriate. We disagree.

The demonstration was nothing more than a vivid visual summarization of the State's view of a large body of evidence that depicted an execution-style killing. It was not improper and was not obvious error.[5]

### VI. Sentencing

■ Ash contends that the trial court exceeded its authority by sentencing him under NDCC 12.1–32–09 as a dangerous special offender. That section authorizes an extended sentence for a person determined to be a dangerous special offender. Under NDCC 12.1–32–09(2), a dangerous special offender who is convicted of a class A, B, or C felony, can be given an extended sentence that is substantially longer than the maximum sentence otherwise authorized for one of those felonies. Under NDCC 12.1–32–01(1), however, the maximum sentence for murder, a class AA felony, is life imprisonment. NDCC 12.1–32–09 has no specific provision for extending the maximum sentence for a person convicted of a class AA felony.

Ash argues that, because his maximum sentence could not be extended under NDCC 12.1–32–09, the trial court could not designate him as a dangerous special offender. The State contends that, although Ash's sentence could not be extended, his designation

as a dangerous special offender was proper and could be considered by the Board of Pardons and the State Parole Board in possible future discretionary actions. On appeal, the trial court is presumed to have acted correctly and the burden of showing error is on the appellant. *Westerso v. City of Williston,* 77 N.D. 251, 42 N.W.2d 429 (1950). Ash has not met his burden of showing error. We are not persuaded by Ash's unsupported assertion that the trial court could not designate him as a dangerous special offender solely because his sentence could not be extended. If there was any error in doing so, it has no foreseeable legal effect.

We affirm Ash's conviction of murder.

VANDE WALLE, C.J., and SANDSTROM, J., concur.

LEVINE, Justice, concurring in the result.

I agree with all of the majority opinion except for its analysis of the prosecutor's closing argument. The state's burden of proving guilt beyond a reasonable doubt *is* enormous and that enormity ought not to be downplayed or made light of by irrelevant references to convictions of other defendants in other cases with other facts, when in those cases the convictions were proved beyond reasonable doubt. It is, after all, the guilt of the defendant in this case, that the state had to prove beyond a reasonable doubt. I, therefore, disagree that the prosecutor's argument implying that the standard of proof was no big deal, "was one method of undercutting defense arguments about the enormity of the State's burden of proving guilt beyond a reasonable doubt." Majority opinion, page 17.

Because I believe that the prosecutor's error was harmless and, therefore, not obvious error, I concur in the result.

NEUMANN, Justice, concurring specially.

I concur in the majority's result. I have two concerns, however, regarding the majority's analysis of the jury communication issue.

---

5. While we find no reversible error in the several parts of the prosecutor's closing argument, nor in his evidentiary tactics that brought about the questions presented by defendant on this appeal,

much in those tactics strike sour notes with us. While few trials can be perfect, the prosecutor's excessive tactics in this case are not a model, and are not to be encouraged.

## I. Invited Error

As the majority tells us, during deliberations the jury sent three different notes to the trial judge, and in each case the judge used written responses to answer the jury's questions. The majority determines that this practice was obvious error, to be considered by this court on review even though no objection was raised below. NDRCrimP 52(b). As the majority points out in at least two of these three instances the trial judge inquired of defense counsel, who was present, whether counsel wanted the defendant personally present while they considered the jury question and decided what response should be made. Each time he was asked, the defense counsel waived his client's right to be present, thereby *inviting* what this court has determined to be obvious error. *Compare State v. Zimmerman*, 524 N.W.2d 111 (N.D.1994) (in which there is no indication that the trial judge inquired regarding the defendant's presence).

Courts have consistently ruled that when error is invited, not even obvious error permits reversal. *United States v. Fulford*, 980 F.2d 1110, 1116 (7th Cir.1992) (trial judge did not commit reversible error by allowing evidence of lack of cooperation, when defendant had testified concerning his "cooperation" with the police); *United States v. Muskovsky*, 863 F.2d 1319, 1329 (7th Cir.1988) (erroneous jury instruction based on defendant's requested jury instruction was not error); *United States v. Feroni*, 655 F.2d 707, 712 (6th Cir.1981) (government witness made a prejudicial statement, trial court offered an immediate cautionary instruction and defense counsel declined); *United States v. Grosso*, 358 F.2d 154, 158 (3rd Cir.1966) (in the absence of both defendant and his counsel, and without notice, trial judge responded to an unrecorded note from the jury without calling the jury into the courtroom; defense counsel, when he was later advised of these facts by the trial court, failed to object). Despite this consistent doctrine, the majority analyzes the events in this case to determine if the alleged error was harmless beyond a reasonable doubt. I believe the better approach is simply to say, as the Third, Sixth, and Seventh Circuits have, that when error is invited, not even obvious error permits reversal.

I would not be concerned, given the majority's conclusion of harmless error, except that the majority's analysis leaves open the possibility that in a future case a lawyer may waive his client's presence at some stage of a criminal proceeding, and this court will decide that the "error" was not harmless beyond a reasonable doubt. The result will be a reversal of a criminal conviction based upon an invited error. Such a result may encourage attorneys who zealously represent their clients (as they are bound to do by our Rules of Professional Conduct), to invite such error purposely.

## II. Personal Presence Versus Jury in Courtroom

My second concern is that the majority has lumped together the analysis of two different rights, which may lead to confusion in the future. The first is defendant's right to appear in person, a right which we have said is of constitutional magnitude. *State v. Smuda*, 419 N.W.2d 166, 168 (N.D.1988). The second is defendant's right to have all responses to jury questions be given to the jurors in the courtroom, a right which is purely statutory (and seems rather pointless, so long as the defendant's right to be present at any conference regarding the question and the answer is properly protected). NDCC § 29–22–05 (1991). Because one right is constitutional and the other is statutory, different standards should be applied in determining whether an error regarding those rights is a basis for reversal.