1997 ND 233

**STATE of North Dakota, Plaintiff and Appellee,**

**v.**

**Carl A. HARMON, III, Defendant and Appellant.**

**Carl Aubrey HARMON, III, Petitioner and Appellant,**

**v.**

**STATE of North Dakota, Respondent and Appellee.**

**Criminal Nos. 960206–960208.**
**Civil Nos. 970100–970102.**

Supreme Court of North Dakota.

Dec. 2, 1997.

Order Denying Rehearing Feb. 12, 1998.

Laura L. Gray (appearance), Assistant State's Attorney, Williston, and Jonathan R. Byers (argued), Assistant Attorney General, Office of the Attorney General, Bismarck, for plaintiff and appellee and for respondent and appellee.

William E. McKechnie (argued) and Law Clerk Robert Bredesen (appearance), William E. McKechnie & Associates, P.C., Grand Forks, for defendant and appellant and for petitioner and appellant.

SANDSTROM, Justice.

[¶ 1] Carl Aubrey Harmon appealed from a judgment of conviction finding him guilty of gross sexual imposition, felonious restraint, and terrorizing. We conclude Harmon's post-conviction appeal was not timely. We also conclude the trial court did not abuse its discretion in denying substitute counsel, Harmon waived his right to counsel, the prosecution's closing remarks were not improper, and Harmon was not deprived of a fair and impartial jury. We therefore dismiss in part and affirm in part.

I

[¶ 2] On July 21, 1995, Carl A. Harmon, III, was charged with gross sexual imposition, felonious restraint, and terrorizing. The Anseth & Johnson law firm was appointed as Harmon's counsel on July 21, 1995, at Harmon's bond hearing. On July 25, 1995, at another bond hearing, attorney LeRoy Anseth appeared on behalf of Harmon. On August 30, 1995, Judge Rustad heard a request for a change of defense attorney after Harmon wrote Judge Rustad a letter stating he had a conflict of interest with Anseth. Harmon explained Anseth had previously represented his eldest son and had once, while leaving the courthouse, remarked "like father, like son." Judge Rustad asked Harmon whether he had been willing to cooperate with Anseth. Harmon replied "Not totally." Upon further questioning by Judge Rustad, Harmon said he and Anseth had irreconcilable differences concerning trial strategy on "[o]ne certain thing at least." Judge Rustad did not ask Harmon to clarify what the one thing was. Judge Rustad then asked Anseth if he believed any past problems were hampering his representation of Harmon. Anseth replied "No." Judge Rustad concluded there was no conflict and denied Harmon's request for substitute counsel.

[¶ 3] After a motion for a change of judge was granted, Harmon wrote to Judge McLees and requested Carl Flagstad be appointed counsel. Judge McLees analyzed Harmon's request under Rule 1.7 of the Rules of Professional Conduct and denied Harmon's request. On November 28, 1995, Anseth wrote to Judge McLees for instructions about his role in light of Harmon's refusal to sign a choice of legal services form. Judge McLees replied on November 29, 1995, stating he concluded Harmon had elected to proceed pro se. Judge McLees stated Anseth was relieved of *"actively defending"* Harmon, and Anseth was to serve in a standby role. Judge McLees issued an order stating Anseth was to "remain available to the Defendant in a standby capacity for *consultation* during the Defendant's pretrial preparation and during the trial of these cases" (emphasis added).

[¶ 4] In another, undated letter, Harmon requested substitute counsel. Judge McLees replied on December 12, 1995, noting the selection of counsel is not the prerogative of the defendant. Judge McLees explained he revoked the appointment of Anseth & Johnson not for conflict-of-interest reasons, but because Harmon refused to accept the services of Anseth and "it appears to the Court that you have decided to proceed pro se...." Harmon wrote Judge McLees multiple letters on December 13, 1995, stating, among other things, Judge Nelson had relieved Anseth from another case for inadequate or insufficient counsel. On February 7, 1996, Harmon wrote another letter, noting Anseth had been brought before the State Bar and Supreme Court. Judge McLees replied by letter on February 13, 1996, once again noting defendants do not have the right to select their own attorneys. In his letter, Judge McLees referred to the North Dakota Supreme Court's decision in *State v. DuPaul,* 527 N.W.2d 238 (N.D.1995).

[¶ 5] On May 6, 1996, during a pretrial conference, Judge McLees stated Anseth was acting in a "standby capacity." Subsequently, the attorneys for the State requested clarification on whether Harmon was asserting his right to counsel or his right to self-representation. Judge McLees recognized Harmon was not representing himself by choice, but was doing so because there was no basis for new counsel and, in refusing Anseth's services, Harmon had "in effect chosen to represent" himself.

[¶ 6] During jury selection, it became clear Harmon did not understand the process, and Judge McLees asked him if he wanted Anseth to conduct voir dire. Harmon initially replied "if he wishes to do so, he is welcome to do so" and, on further comment from Judge McLees, Harmon stated, "Due to my lack of inability [sic], I would guess I will have to ask for his assistance." After further discussion, Harmon again said he felt he was being forced to proceed pro se.

[¶ 7] During an in-chambers conference on May 7, the second day of trial, Harmon told Judge McLees he had decided to let Anseth represent him. Judge McLees initially ordered Anseth to be attorney of record, but later that afternoon reversed himself and ordered Harmon to continue to proceed pro se with Anseth as standby counsel, because to make Anseth attorney of record "would place Mr. Anseth in an entirely untenable, unworkable position." On May 9, however, Judge McLees allowed Anseth to take over, in part because Anseth asked to do so, and in part because Harmon indicated he did not have any problems with Anseth being less effective than he might have been had he had more time to prepare. The rest of the trial was conducted by Anseth. On May 14, 1996, Harmon was convicted on all counts.

[¶ 8] Harmon filed a notice of appeal on August 2, 1996. The direct appeal was stayed pending the outcome of a petition for post-conviction relief. On January 10, 1997, the trial court denied Harmon's petition, and on April 3, 1997, Harmon filed a notice of appeal of the denial of post-conviction relief and a motion to consolidate with the trial court. The State sought to have the appeal of post-conviction relief dismissed as untimely. This Court denied the motion to dismiss by order of April 16, 1997. On June 19, 1997, an order for remand was entered "for the limited purpose of considering an appropriate motion for extension of time to file the Notice of Appeal." A motion was made, but on July 15, 1997, the trial court ruled Harmon had

erroneously asked the court to consider the timeliness of the motion, instead of asking for an extension of time to file.

[¶ 9] Harmon appeals from the August 1, 1996, judgment of the Williams County District Court and the January 10, 1997, memorandum and order of the Williams County District Court. The district court had jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C. §§ 27–05–06(1), 29–32.1–03. This Court has jurisdiction over the direct criminal appeal under N.D. Const. Art. VI, § 6, and N.D.C.C. § 29–28–06.

## II

[¶ 10] The first issue we address is whether Harmon's post-conviction appeal is properly before us. Harmon's April 3, 1997, notice of appeal came 79 days after the order denying post-conviction relief was entered by the trial court. Under N.D.C.C. § 29–32.1–14, an appeal must be filed within 10 days. *See also McMorrow v. State*, 516 N.W.2d 282, 283 (N.D.1994) (applying N.D.R.App.P. 4(a) to post-conviction proceeding). Similar to our decision in *McMorrow*, the June 19, 1997, order of remand was for the purpose of allowing Harmon to make "an appropriate motion for extension of time to file the Notice of Appeal" under N.D.R.App.P. 4(a). N.D.R.App.P. 4(a) permits the trial court "[u]pon a showing of excusable neglect ... [to] extend the time for filing the notice of appeal...." Harmon instead filed a "Motion to Determine the Timeliness of Notice of Appeal." The trial court denied Harmon's motion, stating:

> "It appears to the Court that counsel for the Defendant has misconstrued the directive of the North Dakota Supreme Court contained in its June 19, 1997, ORDER FOR REMAND. This matter was *not* remanded to the trial court for the purpose of determining the timeliness of the Defendant's Notice of Appeal-that issue has already been decided by our high court. Rather, the trial court is to consider 'an appropriate motion for extension of time to file the Notice of Appeal.' (emphasis added). Presumably, any such motion would be supported by a sufficient reason (or reasons).

> "The Defendant's MOTION TO DETERMINE THE TIMELINESS OF NOTICE OF APPEAL is hereby DENIED."

Harmon has thus not shown "excusable neglect," and his appeal is not timely. The post-conviction appeal is therefore dismissed. We thus limit our review to Harmon's direct criminal appeal and the record compiled during the criminal case. See N.D.C.C. § 29–32.1–01(2) ("A proceeding under this chapter is not a substitute for and does not affect any remedy incident to ... direct review of the judgment of conviction or sentence in an appellate court.").

## III

[¶ 11] Harmon argues the trial court abused its discretion in refusing to appoint substitute counsel.

### A

[¶ 12] " 'The matter of substitution of appointed counsel is committed to the sound discretion of the trial court and, absent a showing of good cause for the substitution, a refusal to substitute is not an abuse of discretion.' " *State v. Klein*, 1997 ND 25, ¶ 22, 560 N.W.2d 198 (quoting *In Interest of J.B.*, 410 N.W.2d 530, 532 (N.D.1987)). "The trial court has no duty to appoint a specific counsel, or to continually seek new counsel for a capricious and difficult defendant." *State v. DuPaul*, 527 N.W.2d 238, 243 (N.D. 1995).

### B

[¶ 13] In *J.B.* this Court stated, when deciding a motion for substitute counsel:

> "A request for newly appointed counsel should be examined with the rights and interest of the respondent in mind, tempered by consideration of judicial economy. The court should inquire on the record into the reasons for the complaints about counsel. *The court may rely upon assertions of counsel* because an attorney is an officer of the court whose declarations to the court 'are virtually made under oath.' "

*J.B.* at 532 (citations omitted) (emphasis added). This Court in *J.B.* also stated:

"a trial court should determine: whether an irreconcilable conflict exists between counsel and respondent; whether new counsel would be confronted with the same conflict; the timing of the motion; inconvenience to witnesses; the proclivity of the respondent to change counsel; the quality of counsel. Consideration of these factors *should guide* the trial court's exercise of discretion in deciding whether there is *good cause* for the request to substitute counsel."

*J.B.* at 533 (emphasis added). *See also State v. Lang*, 463 N.W.2d 648, 650 (N.D.1990) (applying factors to requests for substitute counsel in criminal cases).

[¶ 14] Thus, while we have set forth factors for trial courts to consider, these factors are only *guides*, and the defendant must still *show* "good cause." *See State v. Foster*, 1997 ND 8, ¶ 14, 560 N.W.2d 194 ("*Absent a showing of good cause to justify* defendant's request for substitution of counsel, a trial court's refusal to grant such a request is not an abuse of discretion" (emphasis added)). While many of the *J.B.* factors do not seem to weigh against a change, neither do they indicate "good cause" for a change. In regard to the one ground which might have provided "good cause" for a substitution, two different judges determined the comment "like father, like son" did not present an irreconcilable conflict, and Anseth stated his past connections with Harmon would not affect his representation of Harmon. Even though Harmon remains concerned with the statement made by Anseth, as we stated in *Foster*, "[s]imple dissatisfaction with or distrust of appointed counsel is not sufficient to secure a substitution." *Foster* at ¶ 14. The trial court did not abuse its discretion in refusing to appoint substitute counsel.

## IV

[¶ 15] Harmon argues he did not waive his Sixth Amendment right to assistance of counsel because the trial court failed to advise him of the dangers of proceeding pro se and the record shows no "unequivocal statements" by him indicating a desire to proceed pro se.

## A

[¶ 16] A defendant "has a right to self-representation if the defendant knowingly and intelligently elects to proceed pro se." *State v. Hart*, 1997 ND 188, ¶ 6, 569 N.W.2d 451 (citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). This court reviews an alleged violation of a constitutional right de novo. *See State v. LaFromboise*, 542 N.W.2d 110, 112 (N.D. 1996). Because the right to counsel is "so basic to a fair trial ... [its] infraction can never be treated as harmless error...." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967). Similarly, the deprivation of the right to self-representation "is not amenable to 'harmless error' analysis. The right is either respected or denied...." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984).

## B

[¶ 17] In *State v. Foster*, Foster's first appointed counsel, Leslie Johnson, withdrew, and Steve Mottinger was appointed in her place. During the hearing at which Mottinger was appointed, Foster told the court "he would proceed 'by [him]self, if that need be ... if [he] ha[d] to have him for a lawyer' " (alterations in original). Foster requested Johnson be reassigned to the case or a different attorney be appointed. We stated:

"The court properly viewed this as a request for substitution of counsel, and told Foster he '[didn't] get [his] choice of lawyers.' At the end of the hearing, Foster agreed to give his file to Mottinger, consenting to his representation. Foster's mere dissatisfaction with Mottinger and the statement that he would represent himself unless another attorney was provided to him were justifiably not interpreted by the court as a knowing and voluntary request to proceed pro se, but as a request for substitute counsel. Foster did not assert his right to represent himself at any other point during these proceedings, and at the end of the ... hearing, agreed to have attorney Mottinger represent him."

*Foster* at ¶ 15 (alterations in original). *Foster* is, however, distinguishable from this case because, after having had his request for substitute counsel repeatedly denied, Harmon continued to request substitute counsel and to refuse Anseth's services until after the trial had begun. Before us then is the question implicit in *Foster:* May a defendant's continuing requests for substitute counsel and refusal of the services of appointed counsel be "interpreted" as a "knowing and voluntary request to proceed pro se"?

### C

[¶ 18] The Eighth Circuit Court of Appeals has previously interpreted continued requests for substitute counsel after substitute counsel has been denied as a knowing and voluntary waiver of the right to counsel. In *Carey v. State of Minnesota*, 767 F.2d 440, 441 (8th Cir.1985) (per curiam), Carey dismissed his appointed counsel and asked for substitute counsel. The district court denied the request and told Carey his present counsel could serve "in an advisory capacity." In response to the district court's questions about whether Carey wished to try the case himself, Carey replied, " 'No. I don't. I want a different attorney. But since I can't have one I'll conduct my own defense, yes.' " Carey proceeded pro se and was convicted by a jury. *Carey* at 441.

[¶ 19] Carey petitioned for a writ of habeas corpus, and the Eighth Circuit, in a per curiam opinion, affirmed the district court's denial of the writ. The Eighth Circuit's opinion states:

> "A criminal defendant does not have the absolute right to counsel of his own choosing.... Here, however, the trial court properly informed Carey that he did not have the right to a substitution of appointed counsel. Carey stated several times that he chose to conduct his own defense rather than to continue being represented by his original appointed counsel.... The record shows that the trial court inquired into Carey's familiarity with courtroom procedures, noted the difficulty in proceeding without a lawyer, and offered to make Carey's appointed counsel available during the trial should Carey need his assistance (although Carey emphatically declined the

offer). Under the circumstances we agree with the district court that Carey knowingly and intelligently chose to represent himself and to forego the benefit of counsel."

*Carey* at 441–42.

[¶ 20] More recently, in *Meyer v. Sargent*, 854 F.2d 1110, 1114 (8th Cir.1988), the Eighth Circuit stated:

> "appellant's decision to continue to seek the removal of his appointed counsel, after being cautioned that no replacement counsel would be appointed, was the functional equivalent of a 'voluntary' waiver of his right to counsel in the sense that it was not a waiver forced upon him.
>
> "Meyer knew that the court would not appoint him a replacement counsel for Langston, and he knew that if he continued to seek Langston's dismissal the trial court would remove Langston as his representative keeping him in the court on a passive stand-by basis only. Accordingly, Meyer's decision to seek the removal of his counsel despite this knowledge cannot be termed anything other than a voluntary waiver of his right to have counsel represent him at trial."

### D

[¶ 21] Similar to *Carey* and *Meyer*, Harmon's continued requests for substitute counsel after having had his requests for substitute counsel denied must be considered "the functional equivalent of a 'voluntary' waiver of his right to counsel." *Meyer* at 1114; *see also United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir.1989) (finding a knowing and intelligent waiver even though "the record shows that the defendant never clearly stated that he waived his right to counsel [and] on several occasions, the defendant insisted that he was being forced to proceed *pro se* by the court and would have preferred to have new counsel appointed"). Unlike *Foster*, where the defendant before trial accepted Mottinger as counsel after his request for substitute counsel was denied, Harmon continued to request substitute counsel after being told substitute counsel would not be appointed, and only after the trial had begun did he accept Anseth's assistance. *See also State v.*

*Whiteman,* 67 N.W.2d 599, 610–11 (N.D. 1954) (finding the defendant had not "freely and understandingly" waived his right to counsel where he indicated a desire for counsel and at no time had refused counsel).

**E**

[¶ 22] We still must determine, however, whether this "functional" waiver was knowing and intelligent. *See Meyer* at 1114. It does not appear this Court has ever required a specific colloquy to be made on the record. In *Stone v. State,* 171 N.W.2d 119, 124 (N.D.1969), this Court, in addressing whether there had been a waiver of the right to counsel, stated: "It is thus necessary to reexamine the entire record to determine whether the defendant freely and understandingly waived counsel. Whether an accused person has effectively waived his right to counsel depends largely on the facts and circumstances of the particular case." In *Meyer,* the Eighth Circuit recognized "a specific warning on the record of the dangers and disadvantages of self-representation is not an absolute necessity in every case if the record shows that the defendant had this required knowledge from other sources." *Meyer* at 1114. Furthermore, "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation...." *Faretta* at 835, 95 S.Ct. at 2541; *see also Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993) ("[A] criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (footnote omitted)). What is necessary, however, as we repeated in *Hart,* is a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta* at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241–242, 87 L.Ed. 268 (1942)); *Hart* at ¶ 6; *see also Godinez* at 401 n. 12, 113 S.Ct. at 2687 n. 12; *Patterson v. Illinois,* 487 U.S. 285, 292–93, 108 S.Ct. 2389, 2394–95, 101 L.Ed.2d 261 (1988).

[¶ 23] In this case, the record reflects: (1) Harmon had had several previous contacts with the criminal justice system; (2) Judge McLees made certain that copies of the Court Rules and Criminal Code were available to Harmon, and Judge McLees explained to Harmon he would not be given special consideration and the rules would apply equally to him; (3) Harmon, while recognizing his lack of familiarity with proper legal procedures, was very involved with the case, was literate, and directed correspondence to the court; (4) Harmon rejected Anseth as appointed counsel, and Judge McLees then appointed Anseth as standby counsel, vouched for Anseth's ability to handle cases such as Harmon's and, prior to voir dire, emphasized that although Harmon was not required to enlist Anseth's assistance for voir dire, "Mr. Anseth has been trying these cases for many, many years and has participated in jury selection on countless occasions.... [H]is assistance ... may be very beneficial to you." While Harmon's decision to represent himself may have been an error in judgment, this does not foreclose his decision from having been knowingly and intelligently made. *See Godinez* at 400, 113 S.Ct. at 2687. We conclude counsel was made available to Harmon, he was aware of the "dangers and disadvantages of self-representation," and he knowingly and intelligently waived his right to representation.[1]

**V**

[¶ 24] Harmon argues references to Charles Manson and "the gentleman eating

---

1. Although we conclude the lack of a specific on-the-record determination is not necessarily fatal, problems with defendants proceeding pro se are becoming a more common cause before us. *See Falcon v. State,* 1997 ND 200, 570 N.W.2d 719 (1997); *State v. Hart,* 1997 ND 188, 569 N.W.2d 451. Trial courts should be careful to make specific on-the-record determinations about whether a defendant unequivocally, knowingly, and intelligently waived either his right to counsel or self-representation. Such a determination should make clear the dangers and disadvantages of self-representation. *Compare Meyer* at 1115. Furthermore, in cases involving the appointment of standby counsel, trial courts should be careful to explain the role of the standby counsel and whether they will be expected to take over the trial without a continuation should the defendant be unable or refuse to continue representing himself.

people in Milwaukee" made by the prosecution during closing argument are reversible error.

### A

[¶ 25] In its closing argument, the State characterized many of the facts as "bizarre":

"Why should you believe [the alleged victim]? Number one, these acts that she described are so bizarre that they couldn't have been invented by somebody. . . .

"During all of that, what she had to say has remained consistent. That these bizarre things happened and these are truths that are stranger than fiction. . . .

"And another bizarre thing he did was ask her to write a note explaining how all of this was her fault and her idea, that she seduced him.

"And the last bizarre thing are Carl's statements themselves. . . .

"These things were so bizarre and so unique that there is no way that she made up that information."

Anseth, in his closing argument, responded with several statements using the word "bizarre," including:

"What did he [the prosecution] say about doubts? He didn't use the word 'question mark.' He even went so far as to say things were bizarre. Bizarre is a doubt, a very serious doubt."

\* \* \* \*

"If he can't believe it and calls it bizarre, there is reasonable doubt."

To which the State in rebuttal responded:

"Let's pretend that bizarre means doubt. That some how [sic] because these acts are bizarre, that it creates doubt. If bizarre were doubt, Charles Manson could be your mayor. If bizarre is doubt, the gentleman eating people in Milwaukee could be president. Bizarre is Carl Harmon."

### B

[¶ 26] Harmon did not object to the State's argument concerning the references to "bizarre," "Charles Manson," or "the gentleman eating people in Milwaukee." When an objection is not properly preserved

for appeal, "our standard of review is that the challenged remarks must constitute 'obvious error which affects substantial rights of the defendant.'" *State v. Jones,* 557 N.W.2d 375, 378 (N.D.1996) (quoting *State v. Thiel,* 411 N.W.2d 66, 70 (N.D.1987)). "We exercise our power to consider obvious error cautiously and only in 'exceptional situations where the defendant has suffered serious injustice.'" *State v. Ash,* 526 N.W.2d 473, 482 (N.D.1995) (quoting *State v. Smuda,* 419 N.W.2d 166, 168 (N.D.1988)). This Court has previously stated:

"To be prejudicial, absent a fundamental error, improper closing argument by the state's attorney must have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the evidence. 'He is allowed a wide latitude of speech, and must be protected therein. He has a right to be heard before the jury upon every question of fact in the case, and in such decorous manner as his judgment dictates. It is his duty to use all the convincing power of which he has command, and the weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record.'"

*State v. Schimmel,* 409 N.W.2d 335, 342 (N.D.1987) (citation omitted) (quoting *State v. Loyland,* 149 N.W.2d 713, 731 (N.D.1967)).

[¶ 27] This is not a case in which the prosecutor has impermissibly stated his personal opinion about the guilt of the defendant. Furthermore, while one can argue the comments made by the State were invited and, as such, were not obvious error, *see Jones* at 378–79; *Schimmel* at 342–43, these comments were not improper to begin with. The State fairly characterized the evidence as "bizarre" in its closing argument. The State's rebuttal was similarly proper. In *Ash,* the prosecutor discussed the burden of proof during closing argument:

"'Remember this, this burden of proof, this concept of reasonable doubt is the same burden, it's the same standard that has been applied in every criminal case for decades. There isn't a single inmate at the North Dakota State Penitentiary who

didn't have that same burden of proof, that same standard of reasonable doubt applied in his or her case.' "

*Ash* at 482. We concluded:

"The argument was one method of undercutting defense arguments about the enormity of the State's burden of proving guilt beyond a reasonable doubt. The argument was calculated to tell the jury that finding guilt beyond a reasonable doubt was a frequent event, not an extraordinary one. In the circumstances of this case, this argument did not create reversible error."

*Ash* at 482. The State's comments during rebuttal were comparable to those in *Ash.* The State's rebuttal in this case undercut the defense's argument that reasonable doubt is created by "bizarre" facts. The references to "Charles Manson" and "the gentleman eating people in Milwaukee" typify cases involving bizarre facts in which convictions nevertheless resulted. Even if the comments in this case had been improper, when viewed in regard to the entire record, they did not affect Harmon's substantial rights. *See, e.g., State v. Carlson,* 1997 ND 7, ¶¶ 48–49, 559 N.W.2d 802.

## VI

[¶ 28] Harmon also argues he was not provided with an impartial jury, in violation of the Sixth Amendment.

[¶ 29] Harmon's entire argument on this issue was contained in two paragraphs:

"A criminal defendant in a state court is guaranteed an 'impartial jury' by the Sixth Amendment as applicable to the States through the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)[.] Principles of due process also guarantee a defendant an impartial jury. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Although Mrs. Cote may have proclaimed that she would be able to render an impartial verdict, the connection between her, Mr. Anseth and Ms. Glascoe [sic] could have proven very detrimental to Mr. Harmon.

"Mrs. Cote could have been challenged by the Defendant during the choosing of the jury. Under Section 29–17–36 of the North Dakota Century Code (Matter Constituting Implied Bias Specified.) a challenge could have been taken on Mrs. Cote because of '[T]he relationship of guardian and ward, attorney and client, ... or membership in the family of the defendant, or of the person alleged to be injured by the offense charged ...' Mrs. Cote should have been discharged from jury duty prior to serving on the panel in Mr. Harmon's case. Yet, she was not. Therefore, Mr. Harmon could not have received a fair trial due to the implied bias."

We will not consider issues not adequately briefed, argued, or supported on appeal. *First State Bank v. Moen Enterprises,* 529 N.W.2d 887, 893 (N.D.1995). Harmon's conclusory allegations fail to even indicate what Cote's alleged relationship is. This issue has not been adequately raised or supported, and we decline to address it.

## VII

[¶ 30] The judgment of conviction is affirmed, and the post-conviction appeal is dismissed.

[¶ 31] VANDE WALLE, C.J., and NEUMANN, MARING and MESCHKE, JJ., concur.

## ORDER ON REHEARING

SANDSTROM, Justice, on petition for rehearing.

[¶ 32] In his petition for rehearing, Harmon argues his Sixth Amendment right to assistance of counsel was violated when, having previously waived his right to counsel, he again during the course of the trial requested counsel, and the trial court granted and then reversed its grant of counsel.

[¶ 33] When bringing a constitutional challenge, the appellant must bring out the "heavy artillery." *See, e.g., Adams County Record v. Greater North Dakota Ass'n,* 529 N.W.2d 830, 838 n. 2 (N.D.1995). In his motion for rehearing, as well as his original appellate brief, Harmon cited, but did not discuss, two cases addressing whether a defendant may revoke his waiver of counsel, and his main argument was the trial court

could not consider the "untenable position" in which Anseth would be placed. Harmon has cited no case indicating this was an unconstitutional consideration; his appellate brief merely states it was a "blatant violation of Mr. Harmon's Sixth Amendment rights...." Harmon similarly fails to cite a case indicating the trial court's "waffling" violated his rights.

[¶ 34] "[A]n accused who elects to proceed *pro se* need not be permitted to change her mind during the trial." 3 Joseph G. Cook, *Constitutional Rights of the Accused* § 9:1 (3d ed. 1996). Several courts have held it is discretionary for a trial court to allow an accused to revoke a waiver of the right to counsel during trial. *See United States v. Solina,* 733 F.2d 1208 (7th Cir. 1984); *People v. Woods,* 931 P.2d 530 (Colo. Ct.App. 1995); *People v. Price,* 903 P.2d 1190 (Colo.Ct. App. 1995); *State v. Richards,* 552 N.W.2d 197 (Minn. 1996); *State v. Blankenship,* 337 N.C. 543, 447 S.E.2d 727 (1997), *overruled on other grounds by, State v. Barnes,* 345 N.C. 184, 481 S.E.2d 44, 69 (1997). Harmon cites *Saucier v. State,* 562 So.2d 1238 (Miss.1990), as a case supporting an absolute right to reinstatement of the right to counsel. *Saucier,* however, relates to waiver of the right to counsel during police questioning. *See Saucier* at 1244.

[¶ 35] The Minnesota Supreme Court in *State v. Richards,* 552 N.W.2d 197, 205 (Minn.1996), addressed "whether a criminal defendant has an absolute right to reclaim his right to counsel, having once relinquished it...." The Court first stated "standby counsel's role is fundamentally advisory,"[2] but also noted there is little caselaw directly addressing whether "standby counsel should also fill the role of 'second chair' counsel and be ready to step in to continue the trial should the defendant be unable or unwilling to continue his or her own defense." *Richards* at 206. The Court disagreed with Richards' contention he had an

absolute right to relinquish self-representation and "return his standby counsel to 'active duty.'" *Richards* at 206. The Court also noted the trial court balanced Richards' motion "against the progress of the trial to date, *the readiness of standby counsel to proceed,* and the possible disruption of the proceedings." *Richards* at 206–07 (emphasis added). *Richards* is thus similar to the facts of this case. When the trial court initially let Anseth take over, it also refused Anseth's request for a continuance. Part of the reason the trial court reversed itself—the "untenable position" Anseth was in—was because of the denial of the continuance. As such, the trial court would not have abused its discretion had it not permitted Anseth to take over at all. When the trial court allowed Anseth to take over, it reversed itself shortly thereafter. Harmon has provided no case, and we have found none, indicating why this short time period should change the analysis.

[¶ 36] The trial court did not err by considering Anseth's readiness and need for a continuance, and Harmon has failed to cite any cases indicating the trial court's "waffling" deprived Harmon of his constitutional rights. The petition for rehearing is denied.

[¶ 37] VANDE WALLE, C.J., and NEUMANN, MARING and MESCHKE, JJ., concur.

---

2. In *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed. 2d 562 (1975) (emphasis added), the United States Supreme Court stated a court *"may* .... appoint a 'standby counsel'...."* There is, however, no right to the appointment of standby counsel. *See generally* 3 Joseph G. Cook, *Constitutional Rights*

*of the Accused* § 9:3 (3d ed.1996) (citing numerous cases). "Participation by [standby] counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable"! *McKaskle v. Wiggins,* 465 U.S. 168, 182, 104 S.Ct.944, 953, 79 L.Ed. 2d 122 (1984).