2016 ND 65

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Corey Michael COSTA, Defendant and Appellant.**

No. 20150248.

Supreme Court of North Dakota.

March 15, 2016.

Kelly A. Dillon, Assistant State's Attorney, for plaintiff and appellee.

Danny L. Herbel, Bismarck, N.D., for defendant and appellant.

McEVERS, Justice.

[¶ 1] Corey Costa appeals from a judgment entered after a jury found him guilty of gross sexual imposition. Costa argues the prosecutor's closing argument misstated the evidence and improperly vouched for evidence. We reject Costa's arguments and affirm the judgment.

I

[¶ 2] The State charged Costa with gross sexual imposition, alleging he was at least 22 years old and willfully engaged in a sexual act with a person less than 15 years old on December 11, 2012. According to the complainant, she met Costa through Facebook, they initially met in person on the night of December 11, 2012, when he asked her to "hang out" with him, he picked her up at her residence, they went to a welding shop next to an apartment building where he lived, they stayed at the welding shop for about an hour while she had a glass of wine, they then went to Costa's apartment where he "crushed" and "smoked [a] pill" and "inhaled it . . . and blew it down [her] throat," and he thereafter engaged in vaginal intercourse with her. The complainant testified she did not tell her mother about the incident until December 13, 2012, and she was then taken to a hospital for an examination.

[¶ 3] Costa denied having intercourse with the complainant. According to Costa, he knew the complainant for about six months through Facebook, he texted her at about 6 p.m. on December 11, 2012, to "hang out," he picked her up at her place and they went to his welding shop for about ten minutes while he welded a trailer, she asked to use a bathroom, he gave her the access code to get into his apartment building to use his bathroom, she went into his apartment by herself, and she returned to the welding shop and shortly thereafter left the premises.

[¶ 4] During the medical examination on December 13, 2012, a sexual assault kit was collected from the complainant and was taken to the State Crime Lab on June 5, 2013. At trial, Alexandria Gibbs, a forensic scientist from the State Crime Lab, testified about screenings she performed on items included in the sexual assault kit. Gibbs testified about a test for prostate specific antigen (PSA), a protein with high concentrations in semen. She testified oral and vaginal swabs from the complainant were both negative for PSA, and she viewed the swabs under a microscope and saw no spermatozoa on the swabs. Gibbs

testified she also viewed clothing from the sexual assault kit under a microscope and did not visually observe spermatozoa on the clothing. She testified if spermatozoa had been observed, the test result would have been denoted "semen detected." She testified a PSA test of cuttings from two pair of the complainant's underwear were positive for proteins found in semen and were labeled "presumptively positive for semen." Gibbs testified she was unable to microscopically see spermatozoa on the underwear, but she did not rule out the presence of semen on the underwear. A report prepared by Gibbs and admitted into evidence at trial listed items in the sexual assault kit and said results on the two pair of the complainant's underwear were "presumptively positive for semen." The report on those two items included a note that "[t]he presence of semen could not be confirmed by microscopic techniques" and "[a] positive p30[, PSA,] result could be attributed to vasocetomized, azoospermic or pre-pubescent males; breast milk, urine, vaginal fluid, cancer, or postmortem samples."

[¶ 5] Jennifer Penner, a DNA analyst from the State Crime Lab, tested the cuttings from the two pair of the complainant's underwear and testified she was unable to make a comparison on a minor contributor of DNA on the underwear using standard DNA testing. Penner testified she developed a Y-chromosomal partial profile from one pair of the underwear containing a mixture of at least two people, with the predominant Y-chromosomal profile matching a known sample from Costa. Penner testified that profile came from item 2A–F, the cutting that was labeled as from the complainant's "underwear worn immediately after incident." Penner testified Y-chromosomal testing specifically targets the Y-chromosome, which only males have, and explained:

The predominant Y-chromosome profile from item 2A–F[.] I was able to calculate frequencies of occurrence in four different population groups. In the first one which was the African American population group, the frequency of occurrence is approximately 1 in 645. In the Caucasian population the frequency of occurrence is approximately 1 in 1,374. In the Hispanic population, the frequency of occurrence is approximately 1 in 535. And in the Native American population group, the frequency of occurrence is approximately 1 in 36.

. . . .

Basically what that means when the frequency of occurrence is 1 in 1,374. What that means is if I would randomly select 1,374 Caucasian individuals I would expect one person out of that group to have DNA profile—a Y-chromosomal DNA profile that would match the predominant Y-chromosomal DNA profile from item 2A–F.

[¶ 6] During closing argument to the jury, the prosecutor discussed the scientific evidence:

The laboratory analysis starts at the basic level. First, we look for bodily fluids. That's the AP process. If the bodily fluids are present, then we proceed to the next step which is the AP being the protein, PSA being the male-specific protein. And remember Ms. Gibbs testified that while it can show the test they use, that test card they use can show positives. Typically PSA, or P30, is only—is found in very high levels in semen. So if that finding is made, then further testing is done. And that is where the actual DNA analysis comes into play. The vaginal swabs showed no semen. Those swabs were taken 24–36 hours after this event is alleged to have happened. Various factors come into play there, and you will see when you go

through these forms that were completed by the sexual assault nurse examiner. She talked about step 5A: prior to evidence collection, the patient has—and she checked various items. Urinated, defecated, genital wash, bath, shower, changed clothes. Those were all factors that the DNA analyst testified will effect how long semen stays in the vaginal cavity. And [the complainant] did all of those things. So it's no surprise that after 36–48 hours there's nothing left there. However, on the inside of the underwear that [the complainant] put on immediately after this assault—Ms. Gibbs testified it was in the crotch area on the inside of the underwear. It was presumptively positive for semen. The simple break down of Ms. Penner's testimony is that the sample was positive for [Costa's] Y-chromosomal DNA. So how did it get there? How did [Costa's] DNA wind up inside [the complainant's] underwear? Initially [Costa] said he was with her for twenty minutes, he told Lieutenant Sundbakken 'I was with her for twenty minutes. We were never in my apartment.' Now today he says 'I was with her for twenty minutes, she asked to go to the bathroom, I gave her the key to the secure door, she left and came back shortly and then ten minutes later she announced she was leaving.' So apparently [Costa] would have you believe that after being with him for only ten minutes and watching him weld, [the complainant] went to his apartment, collected his semen containing his DNA, deposited it on her own underwear—

MR. SCHULTZ: I'll object. That wasn't the testimony, Your Honor.

THE COURT: Ms. Dillon is free to make any connections and argue any inferences from the evidence that she deems is reasonable. So overruled.

MS. DILLON: She went to his apartment, collected his semen from somewhere in the apartment which contained his DNA, and deposited it on her own underwear. Because he says their [sic] was no sexual contact. There was no sex between them at all. She simply sat and watched him weld then went to his apartment, came back, and left. That's a pretty elaborate story and a pretty elaborate plan to get out of being punished, getting grounded potentially for staying out. How did [Costa's] DNA get inside [the complainant's] underwear? The most logical conclusion or answer to that question was answered by [the complainant]. They had vaginal intercourse; he ejaculated, she put on her underwear afterwards. His semen is secreted onto her underwear.

[¶ 7] During rebuttal closing argument, the prosecutor discussed the DNA evidence and the Y-chromosomal DNA:

So that takes us back then to the DNA. It is a mad coincidence that Mr. Costa's DNA—Y-chromosomal DNA, I acknowledge that, shows up inside [the complainant's] underwear. If it were a matter of her going into his bathroom, using his bathroom in his apartment that he shares with another male who apparently is not there very often, and that it was somehow some sort of incidental contact in that bathroom then why is there nothing on her jeans? Or nothing on her shirt? Why is it only on the inside of the crotch area of her underwear? If this were some sort of incidental contact with a surface in that bathroom, it's logical that the more likely location of that bodily fluid containing this DNA is going to be on her outer clothing. On her jeans. But there was nothing. There was no fluorescence observed.

[¶ 8] After the case was submitted to the jury, the jury returned a note to the district court asking, "Can someone pro-

vide additional explanation of the DNA testing and the results?" After consulting with counsel and without objection, the district court responded, "No. The testimony and record is closed. No further evidence or argument can be provided." The jury thereafter found Costa guilty of gross sexual imposition.

## II

[¶ 9] Costa argues the prosecutor's closing argument to the jury about his semen on the complainant's underwear misstated the evidence and violated his due process right to a fair trial by an impartial jury. Costa claims the prosecutor's statements about the complainant collecting semen from somewhere in his apartment misstated the evidence because there was no evidence of the presence of semen on the complainant's underwear.

[¶ 10] "Arguments by counsel must be limited to the facts in evidence and the proper inferences flowing from them." *State v. Ebach,* 1999 ND 5, ¶ 10, 589 N.W.2d 566. In *State v. Evans,* 1999 ND 70, ¶¶ 8, 10–11, 593 N.W.2d 336, we outlined criteria for assessing a claim involving a prosecutor's closing argument about facts not in evidence:

> "It is fundamental that counsel cannot rely or comment on facts not in evidence during closing argument." *U.S. v. Henry,* 2 F.3d 792, 795 (7th Cir.1993). *See also State v. Weatherspoon,* 1998 ND 148, ¶ 23, 583 N.W.2d 391; *Williston v. Hegstad,* 1997 ND 56, ¶ 8, 562 N.W.2d 91; *State v. Kaiser,* 417 N.W.2d 376, 379 (N.D.1987)....
>
> The United States Supreme Court has addressed improper prosecutor comments in argument to the jury:
>
> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the

defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

> *United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). *See also Williston v. Hegstad,* 1997 ND 56, ¶ 8, 562 N.W.2d 91.

"The control of closing arguments is largely within the discretion of the trial court, and we will not reverse on the ground that a prosecutor exceeded the scope of permissible closing argument unless a clear abuse of the trial court's discretion is shown." *State v. Ash,* 526 N.W.2d 473, 481 (N.D.1995). To establish a trial court abused its discretion with regard to a prosecutor's argument, a defendant must establish the argument was improper and prejudicial. *State v. Schimmel,* 409 N.W.2d 335, 342 (N.D.1987). "To be prejudicial, absent a fundamental error, improper closing argument by the state's attorney must have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the evidence." *Id.* "A state's attorney's statements of fact to the jury which are not warranted by the evidence are improper and such statements are presumed to be prejudicial unless harmless in themselves." *State v. Mehralian,* 301 N.W.2d 409, 418 (N.D.1981).

[¶ 11] Although Gibbs testified she was unable to make a microscopic visual observation of spermatozoa on the complainant's underwear, she testified the PSA tests of cuttings from the complainant's underwear

were positive for proteins found in semen and the results of those tests were denoted "presumptively positive for semen." Gibbs testified she did not rule out the presence of semen on the underwear, and Penner testified a Y-chromosomal DNA partial profile from one pair of underwear matched a known sample from Costa.

[¶ 12] The prosecutor's closing argument about Costa's semen on the complainant's underwear constitutes a fair and permissible inference from the admitted evidence, and Costa was not precluded from arguing, and did argue, there was no semen found on the complainant's underwear. Moreover, the jury was instructed that counsel's statements were not evidence and to disregard any of counsel's statements that were not supported by the evidence. A jury is presumed to follow a district court's admonition and instructions. *State v. Azure*, 525 N.W.2d 654, 656 (N.D.1994).

[¶ 13] The prosecutor's argument was made in the context of questioning Costa's version of the incident and was prefaced with the statement that Costa "would have you believe" the complainant went to his apartment, "collected his semen containing his DNA, [and] deposited it on her own underwear." We conclude the prosecutor's closing argument did not misstate the evidence and permissible inferences from the evidence. We therefore conclude the prosecutor's argument was not improper and the district court did not abuse its discretion in overruling Costa's objection to that argument.

## III

[¶ 14] Costa argues the prosecutor's closing argument improperly vouched for the DNA evidence. During closing argument, the prosecutor said "Mr. Costa's DNA–Y–chromosomal DNA, I acknowledge that, shows up inside [the complainant's] underwear."

[¶ 15] The record reflects Costa did not object to the prosecutor's argument at trial, and in the absence of an objection, our review is limited to whether his claim involves obvious error affecting his substantial rights under N.D.R.Crim.P. 52(b). *See Evans*, 1999 ND 70, ¶ 9, 593 N.W.2d 336.

[¶ 16] In *State v. Schmidkunz*, 2006 ND 192, ¶ 6, 721 N.W.2d 387, we discussed our review of claims involving obvious error:

"This Court exercises its authority to notice obvious error cautiously and only in exceptional circumstances in which the defendant has suffered a serious injustice." *State v. Clark*, 2004 ND 85, ¶ 6, 678 N.W.2d 765 (citing *State v. Anderson*, 2003 ND 30, ¶ 8, 657 N.W.2d 245, and *State v. Evans*, 1999 ND 70, ¶ 9, 593 N.W.2d 336). In analyzing obvious error claims under North Dakota law, we have applied a plain error framework, explaining an appellate court may notice a claimed error that was not brought to the district court's attention if there was "(1) error, (2) that is plain, and (3) affects substantial rights." *State v. Olander*, 1998 ND 50, ¶¶ 13–14, 575 N.W.2d 658. Once the defendant establishes that a forfeited plain error affects substantial rights, this Court has discretion to correct the error, and should correct the error where it seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.* at ¶ 16.

[¶ 17] The context of the prosecutor's statement about the DNA evidence indicates that the prosecutor was acknowledging the shortcoming of the particular type of DNA evidence, Y-chromosomal DNA as opposed to a standard DNA test, and that the prosecutor was not vouching for the Y-chromosomal DNA evidence.

The prosecutor's closing argument about the DNA evidence did not vouch for the Y-chromosomal DNA and was not error under our framework for analyzing claims alleging obvious error.

IV

[¶ 18]  We affirm the judgment.

[¶ 19]  GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM and CAROL RONNING KAPSNER, JJ., concur.